# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 15, 2009

Charles R. Fulbruge III
Clerk

No. 08-30987

BRYCE MANIS; MADISON MANIS,
through their natural tutrix, Tonya Plaisance

Plaintiffs-Appellees

v.

ARTHUR LAWSON, in his capacity as Chief of Police for the City of Gretna;
GRETNA CITY;
DOUGLASS ZEMLIK, Officer

Defendants-Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JONES, Chief Judge, and PRADO and HAYNES, Circuit Judges.

EDITH H. JONES, Chief Judge:

Police officer Douglass Zemlik ("Zemlik") fatally shot Michael D. Manis, Jr., ("Manis") while responding to a call that Manis's vehicle was idling on railroad tracks at an intersection in Gretna, Louisiana. Manis's surviving children brought a 42 U.S.C. § 1983 action alleging that Zemlik used excessive force in violation of the Fourth Amendment. The district court tersely denied Zemlik's motion to sustain qualified immunity without a written explanation

other than to conclude that material fact issues exist.[1] Zemlik has filed this interlocutory appeal. Because the material facts in this case are undisputed and do not establish a constitutional violation, we hold that summary judgment in favor of Zemlik is appropriate. Alternatively, even if Zemlik used excessive force, he is nonetheless entitled to qualified immunity because his conduct was not objectively unreasonable in light of the clearly established law at the time of his actions. We reverse and remand to the district court for entry of summary judgment.

## I. BACKGROUND

Around 3:00 a.m. on October 3, 2005, David and Janet Jenkins, a husband-and-wife delivery team operating a tractor-trailer rig, stopped at a red light at the intersection of Gretna Boulevard and Belle Chasse Highway. Directly in front of the rig, Manis's Jeep Cherokee was idling on the intersection's railroad tracks and did not move after two light cycles passed and the Jenkinses sounded their horn. David Jenkins called the Gretna Police Department and two units responded. Sergeant Scott Vinson ("Vinson") parked his cruiser in front of Manis's SUV, approached and observed Manis sleeping or passed out in the driver's seat, and then walked around the back of the car to approach on the passenger's side. Officer Douglass Zemlik parked behind the Jenkinses' rig and

---

[1] The district court also denied summary judgment on the plaintiffs' state law negligence claims against Officer Zemlik, Police Chief Arthur Lawson, and the City of Gretna, but this decision was not appealed.

approached on the driver's side. At some point, Vinson opened the passenger's side door and placed the Jeep in "park." While identifying themselves as policemen, both officers verbally and physically tried to wake Manis.

The parties dispute what happened after Manis was roused. According to Zemlik and Vinson, Manis immediately began shouting obscenities and flailing his arms aggressively at them. After Zemlik opened the driver's side door and attempted to calm Manis, Vinson turned the ignition off and walked around the front of the vehicle to join Zemlik. Manis, still seat-belted, then began to repeatedly reach underneath the front seat. The officers drew their weapons and ordered Manis several times to show his hands. He ignored them. When Manis appeared to retrieve some object and began to straighten up, Zemlik fired four rounds, killing Manis.

The Appellees contend that Manis did not curse the officers and only moved his arms out of drunken confusion, not combativeness. They state that Manis, oblivious to his fastened seat belt, tried unsuccessfully to get out of the Jeep at Zemlik's instruction. Manis then leaned forward over the front seat in a stupor, leading the officers to order him to show his hands. According to the Appellees, Zemlik shot Manis as he was attempting to straighten up and raise his hands in a display of submission. No weapon was recovered.

An autopsy showed that Manis was drunk and under the influence of cocaine and barbiturates at the time of his death.

## II. JURISDICTION AND STANDARD OF REVIEW

"The denial of a motion for summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine 'to the extent that it turns on an issue of law.'" *Flores v. City of Palacios*, 381 F.3d 391, 393 (5th Cir. 2004) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985)). Where, as here, the district court finds that genuinely disputed, material fact issues preclude a qualified immunity determination, this court can review only their materiality, not their genuineness. *Wagner v. Bay City, Tex.*, 227 F.3d 316, 320 (5th Cir. 2000) (citing *Colston v. Barnhart*, 130 F.3d 96, 98 (5th Cir. 1997)). If a factual dispute must be resolved to make the qualified immunity determination, that fact issue is material and we lack jurisdiction over the appeal. *See Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 483 (5th Cir. 2001).

In this case, the district court held without explanation that "there are disputed issues of material fact as to whether the defendant's conduct was objectively reasonable in light of the legal rules clearly established at the time of the incident." When the district court

> denies the motion simply because 'fact issues' remain, this Court has two choices. We can either scour the record and determine what facts the plaintiff may be able to prove at trial and proceed to resolve the legal issues, or remand so that the trial court can clarify the order.

*Thompson v. Upshur County, TX*, 245 F.3d 447, 456 (5th Cir. 2001) (citations omitted). Given the limited record here, and because we are cognizant that qualified immunity entitles a defendant to avoid the "burdens of litigation" as well as liability, *Mitchell*, 472 U.S. at 526, 105 S. Ct. at 2815, we have reviewed the record, rather than remand, and thus "resolv[e] immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991) (per curiam).

Whether there are material issues of fact is reviewed *de novo*. *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (citing *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007)). The plaintiff's factual assertions are taken as true to determine whether they are legally sufficient to defeat the defendant's motion for summary judgment. *Freeman*, 483 F.3d at 410. "To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" *Ontiveros*, 564 F.3d at 382 (quoting *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991)).

## III. DISCUSSION

After *Pearson v. Callahan*, 129 S. Ct. 808 (2009) (overruling in part *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001)), a court may conduct the two-pronged qualified immunity inquiry—whether (1) defendant's conduct violated a constitutional right and (2) that right was clearly established at the

time of the misconduct—in any sequence. Here, the summary judgment record supports a finding in favor of Officer Zemlik on both prongs.

## A. Constitutional Violation

To prevail on an excessive force claim, a plaintiff must show "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros*, 564 F.3d at 382 (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)). An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others. *Id.* (citing *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003)). The question is one of "objective reasonableness," not subjective intent, and an officer's conduct must be judged in light of the circumstances confronting him, without the benefit of hindsight. *Id.* at 382-83 (citing *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872 (1989)).

This court has found an officer's use of deadly force to be reasonable when a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon. *See Ontiveros*, 564 F.3d at 385; *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991); *Young v. City of Killeen, TX*, 775 F.2d 1349, 1352-53 (5th Cir. 1985). In *Ontiveros*, the suspect ignored the officer's commands to show his hands and was shot when he

reached into a boot for what the officer believed could have been a weapon. 564 F.3d at 381. In *Reese*, the suspect repeatedly disobeyed the officer's instructions to raise his hands, drawing fire when he tipped his shoulder and reached below the officer's line of sight to the floorboard of his vehicle. 926 F.2d at 500. In *Young*, the suspect responded to the officer's order to step out of his car by reaching down to the floorboard instead, also drawing fire. 775 F.2d at 1351. In this case, Zemlik testified in his deposition that Manis ignored approximately five commands to show his hands and repeatedly reached under the front seat. Zemlik stated that he fired his weapon when Manis "made a bigger lunge like he had retrieved something." Vinson's deposition corroborated Zemlik's testimony,[2] as did the statements of David and Janet Jenkins, the only other eyewitnesses.[3]

---

[2] "[H]is [Manis's] body actually dipped down, and from my vantage points, both of his arms completely disappeared. I could not see neither one of them. Officer Zemlik instantly started shouting commands to him. "Let me see your hands. Let me see your hands. Let me see your hands." . . .

Well, like I said, his hands were underneath the seat, and he made like, and I know that he cannot write down what I am trying to show you, but he was making motions like this, like kind of rocking like he was reaching for something underneath the seat. This went on, and then finally it came to a point where it appeared or I believed that he was obtaining whatever it was that he was trying to get because he started to do this. His body kind of jerks up a little bit. It just gives you the appearance that he was able to gain control of whatever it was he was reaching for."

[3] Third party statements included in a police report are not admissible under the public records exception to the hearsay rule. 2 MCCORMICK ON EVIDENCE § 296 (6th ed. 2006). We consider the Jenkins's statements, contained in the Gretna Police Department's investigative report, only because neither party objected to the admissibility of the statements in the proceedings below.

\*\*\*

The Appellees do not dispute the *only* fact material to whether Zemlik was justified in using deadly force: that Manis reached under the seat of his vehicle and then moved as if he had obtained the object he sought. The Appellees state in passing that Manis was "supposedly reaching" under the driver's seat and that he "allegedly had his hand" there, but they nowhere offer evidence calling into question whether Manis actually reached under the seat in defiance of the officers' commands. At most, the Appellees point to their expert's affidavit, in which the expert concedes that without a visual demonstration of Manis's actions, he cannot opine definitively whether deadly force was justified. The

---

"[D.]Jenkins: Let me see your hands, let me see your hands. Both of them [Zemlik and Vinson] were screaming that. Then that's when the uh...after several repeats of that, that's when um...it looked like the guy [Manis] he made some kind of jerk or something. I know I saw the car move right before he opened fire. . . .

Becnel: . . . What did you actually see?

Jenkins: Um...kind of like he was trying to yank something inside. Like he was with his arm or something. Like I said I could not see his arm. The arm that had disappeared.. . .

Jenkins: So it was like he was trying to lean down reaching something."

\*\*\*

"[J.] Jenkins: . . . And the next thing you know his hands go down and the officers both officers were yelling. They drew their guns and they started yelling you know 'get your hands up, get your hands up.' Um...'get them where we could see them.' And he [Manis] didn't comply and then rounds were fired.

Becnel: Ok before the rounds were fired, did he make any other movements anywhere else?

Jenkins: Just-just jerking and like I said the arm went down. The hands or at least that one arm went down and it just jerking."

expert's subsequent speculation that deadly force was unjustified is insufficient to create a genuine, material fact issue. *See Ontiveros*, 564 F.3d at 384.

Additionally, the Appellees argue that Zemlik "knew there wasn't [a weapon]" by pointing to the fact that neither Vinson nor Zemlik checked under the seat for a weapon after Manis was shot. But this undisputed fact does not contradict Zemlik's testimony that he shot Manis because he believed Manis had retrieved a weapon. As in *Ontiveros*, the Appellees "are attempting to use [this] undisputed fact[] to imply a speculative scenario that has no factual support." 564 F.3d at 383. In contrast, Zemlik's testimony, like that of the officer in *Ontiveros*, is corroborated by the other officer who was present at the scene as well as two eyewitnesses. *Id*.

Appellees also argue various points based upon their perception of Manis's actual intention underlying his conduct. However, Manis's actual intention—if, indeed, that could be discerned—is not the test. The question is whether in view of Manis's conduct, Zemlik was objectively reasonable in believing Manis posed a threat of serious harm.

Nor are any of the other disputed facts material to the Appellees' claim of excessive force. The Appellees assert that Manis did not curse the officers, did not make a fist when flailing his arms, and attempted to comply with the officers' instructions to step out of his car. They point to inconsistencies in the police officers' depositions regarding which officer Manis lunged toward when he

was shot, the direction Manis was facing, and whether Vinson saw something in Manis's hand. They take issue with Zemlik's testimony concerning the length of time he shouted at Manis to show his hands. Finally, they question whether any weapon was ultimately located under Manis's seat and contend that the Gretna Police Department's investigation of the shooting was biased. None of these assertions, however, bear on whether Manis, in defiance of the officers' contrary orders, reached under the seat of his vehicle and appeared to retrieve an object that Zemlik reasonably believed to be a weapon. *This* was the act that led Zemlik to discharge his weapon, and it is undisputed. In light of Manis's undisputed actions, Zemlik's use of force was not excessive.

## B. Existence of a Clearly Established Right

Even if we found, contrary to our above conclusion, that Zemlik violated Manis's Fourth Amendment rights, summary judgment in favor of Zemlik would still be appropriate because his conduct was objectively reasonable in light of the clearly established legal rules at the time of the shooting. To overcome the affirmative defense of qualified immunity, a plaintiff must show that the government official violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). Qualified immunity shields from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096

10

(1986). If the law at the time of a constitutional violation does not give the officer "fair notice" that his conduct is unlawful, the officer is immune from suit. *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004). This standard thus protects an officer with a mistaken, yet reasonable, understanding of the law from the "hazy border between excessive and acceptable force." *Id* at 201, 125 S. Ct. at 600 (quoting *Saucier v. Katz*, 533 U.S. 194, 206, 121 S. Ct. 2151, 2158 (2001)).

Accordingly, the "objective legal reasonableness" of an officer's conduct must be "assessed in light of the legal rules that were 'clearly established' at the time" of his action. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 3038 (1987) (citation omitted). A right is clearly established if, in light of preexisting law, the unlawfulness of an action would be apparent to a reasonable officer. *Id.* at 640, 107 S. Ct. at 3039. The inquiry here is whether, under the law in effect at the time that Zemlik shot Manis, no reasonable officer could have believed deadly force was lawful when a suspect disobeyed commands to show his hands, moved his hands out of the officer's line of sight, and appeared to retrieve a weapon.[4]

---

[4] We note that the "right" that must be clearly established is not Manis's general Fourth Amendment right to be free from an unreasonable seizure. The Supreme Court has explained that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692, 1700 (1999) (citing *Anderson*, 483 U.S. at 641, 107 S. Ct. at 3040). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson*, 483 U.S. at 639, 107 S. Ct. at 3039. Thus, we conduct the more

Before October 2005, Supreme Court precedent and cases in this circuit authorized deadly force when an officer had "probable cause to believe that the suspect pose[d] a threat of serious physical harm." *See, e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11-12, 105 S. Ct. 1694, 1701 (1985); *Reese v. Anderson*, 926 F.2d 494, 500-01 (5th Cir. 1991); *Young v. City of Killeen, TX*, 775 F.2d 1349, 1352-53 (5th Cir. 1985). Applying that precedent, this court upheld the use of deadly force when a suspect reached below an officer's sight line in defiance of contrary orders and appeared to retrieve a gun. *See Reese*, 926 F.2d at 501; *Young*, 775 F.2d at 1353. Thus, far from clearly establishing that Zemlik's conduct was unlawful, the controlling authority in this jurisdiction did not prohibit his use of deadly force in the similar situation confronting him. Moreover, even if contrary authority existed, the "cases taken together [would] undoubtedly show that this area is one in which the result depends very much on the facts of each case" and certainly would not "clearly establish" that Zemlik's conduct violated the Fourth Amendment. *Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S. Ct. 596, 600 (2004). Therefore, Zemlik's actions were objectively reasonable under clearly established law, and he is entitled to qualified immunity.

---

particularized inquiry of whether preexisting law clearly established Manis's right to be free from deadly force in the circumstances Zemlik confronted. *See id.* at 640–41, 107 S. Ct. at 3039.

## CONCLUSION

Even if the disputed facts are construed favorably to the Appellees, summary judgment is appropriate because none of the disputed facts on which the district court may have relied in denying summary judgment are material. Under this court's precedents, Officer Zemlik could have reasonably believed that Manis posed a threat of serious physical harm to himself or to others when Manis moved his arm out of Zemlik's sight and reasonably appeared to be reaching under his seat for a weapon. Zemlik's use of deadly force did not violate Manis's Fourth Amendment rights; moreover, Zemlik's conduct was objectively reasonable in light of clearly established law. The judgment of the district court is **REVERSED**, and the case is **REMANDED** for entry of judgment in favor of Appellant.