# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 15, 2013

No. 12-40749

Lyle W. Cayce
Clerk

ESTATE OF LAURA ALLISON; WILLIAM ALLGOOD; KIMBERLY NOLET,

Plaintiffs-Appellees

v.

BILL WANSLEY; DAVID HAYES; CYNTHIA HYATT;
MICHAEL ALLISON; RYAN ZELLER; JOSHUA DEAN; BOBBYE LEFFEL,

Defendants-Appellants

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:11-cv-00100

Before STEWART, Chief Judge, and BENAVIDES and HIGGINSON, Circuit
Judges.
PER CURIAM:[*]

Defendants-Appellants ("Appellants") filed this interlocutory appeal of the
district court's denial of summary judgment on the defense of qualified
immunity.  Plaintiffs-Appellees ("Appellees") had brought suit in the district
court, alleging that Appellants treated Laura Allison's serious medical needs
with deliberate indifference while she was incarcerated in the Wood County Jail,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 12-40749

thereby resulting in her death. We REVERSE and REMAND for further proceedings.

## I. FACTUAL & PROCEDURAL HISTORY

In February 2007, Decedent Laura Allison ("Decedent Allison") was arrested in Wood County, Texas for driving under the influence of alcohol. As a condition of her sentence, she was required to attend the Victim Impact Panel ("VIP") class, which the Wood County Probation Office conducted. On March 17, 2009, Decedent Allison arrived at a VIP class, which Adult Probation Officer/Community Supervision Officer Colin Kovic ("Officer Kovic") was facilitating that day. When Officer Kovic first saw Decedent Allison as she arrived at the class around 5:30 PM, he noticed that her eyes were glassy and red, her speech was slow, and she smelled of alcohol. Decedent Allison explained her condition to Officer Kovic by stating that she was suffering from allergies and had taken a double dosage of her allergy medication. Officer Kovic requested several times that Decedent Allison take a breathalzyer examination, but she refused. Officer Kovic thus called the Wood County Sheriff's Department, which sent Quitman Police Officer David Barkley ("Officer Barkley") to the scene. Texas Department of Public Safety Trooper Brandon Owens acted as backup for Officer Barkley.

When Officer Barkley arrived, Officer Kovic told Officer Barkley that he had requested that Decedent Allison take a breathalyzer test, but she had refused. Officer Barkley also requested that she take a breathalyzer examination, but she again refused. Officer Barkley told Decedent Allison that he could smell alcohol about her person, but she denied that she had been drinking. Officer Barkley then performed a simple sobriety test by requesting that she stand on one leg, but she failed the test, as she was unable to keep her leg raised. Officer Barkley therefore placed her under arrest at approximately

No. 12-40749

6:37 PM and transported her to the Wood County Jail ("Jail"), where she arrived at approximately 7 PM.[1]

Officer Barkley's arrest report stated: "Suspect arrived at Probation Office had been drinking and stated took prescription meds not in accordance with direction." (capitalization in original omitted). Officer Barkley's Complaint/With Probable Cause Affidavit states, in pertinent part:

> I noticed the odor of an alcohol beverage emitting from [Decedent] Allison's breath. I further observed she was confused in answering questions. Her speech was slurred and she was staggered [sic]. [Decedent] Allison stated she had misused her prescription medications. At this time I attempted to have [Decedent] Allison complete a standard field sobriety test which she could not. [Decedent] Allison did appear in a public place while intoxicated and did present a threat [illegible] danger to herself or others.

(capitalization in original omitted).

Officer Kovic later attested in his affidavit that, on the day of Decedent Allison's arrest, she appeared intoxicated, but not so intoxicated as to require medical help. He averred that she was able to walk without assistance and carry on a conversation with him. He further attested that, if she had appeared to need medical help, he would have requested emergency assistance for her.

Defendant Jail Sergeant David Hayes ("Sergeant Hayes") was the supervisor at the Jail the night of Decedent Allison's arrest, and he booked her into the Jail. Decedent Allison was crying and upset because she was arrested and would be unable to see her grandchildren the next day as she had planned. Sergeant Hayes used a screening form to obtain information from her regarding any "suicide and medical and mental impairments." Sergeant Hayes noted her

---

[1] While the arrest report indicates the arrest time was 6:37 PM and booking time was 7 PM, we note that the parties and the district court use slightly different times for these events; these differences are immaterial to the issues presented on appeal, however.

medications as "Paxil, Disapam [sic], [and] Clamara [sic]," and Decedent Allison reported to him that she attempted suicide a year earlier by using pills because she was depressed.  In response to the screening form's question, "Observed to be under the influence of alcohol drugs or withdrawal?" Sergeant Hayes answered, "No."  In response to the question, "Does arresting officer or any other person believe that the inmate is at risk due to a medical condition, mental illness, mental retardation, or suicide concern?" he also answered, "No."  In his deposition, Sergeant Hayes testified that, while he did not recall whether he had read the specific information in Officer Barkley's arrest report that Decedent Allison had taken prescription drugs not in accordance with directions, he typically reads arrest reports when a new inmate is booked into the Jail.

Several Jailers testified in deposition regarding Decedent Allison's condition when she arrived at the Jail.  Defendant Jailer Joshua Dean ("Jailer Dean") testified that Decedent Allison did not appear to be in any medical distress during the booking process:  she was not falling down, vomiting, or bleeding, and she was coherent, able to stand on her own, and capable of answering all of Jailer Dean's questions.  Defendant Jailer Cynthia Hyatt ("Jailer Hyatt") likewise testified that Decedent Allison exhibited no signs of medical distress. Additionally, Jailer Hyatt testified that she observed Decedent Allison from 7 PM until 8:30 PM, that she was doing "okay," and that by 8:30 PM, she was sleeping.  Jailer Hyatt further testified that she asked Decedent Allison if she needed anything at one point, but Decedent Allison said that she did not.  Defendant Jailer Bobbye Leffel ("Jailer Leffel") also assisted with Decedent Allison's booking by conducting the pat-down search.  Jailer Leffel testified that Decedent Allison was "highly upset" about not getting to see her grandchildren and "just appeared to be intoxicated."  Jailer Leffel further testified that Decedent Allison was able to carry on a conversation and did not stumble, fall, or trip on the way to her cell.

No. 12-40749

On the other hand, Defendant Jailer Michael Allison ("Jailer Allison")[2] noticed Decedent Allison "passed out" on the bench in her cell around 8 PM. By "passed out," Jailer Allison meant "she was laid down asleep, and I know she had got brought in for PI [public intoxication], for some sort of intoxication." Due to Jailer Allison's knowledge that Decedent Allison was arrested for "some sort of intoxication," he asked Defendant Jailer Ryan Zeller ("Jailer Zeller") if Decedent Allison "was messed up with pills or alcohol." However, Jailer Allison also testified that he "didn't know how messed up" she was but she "looked fine," despite the fact that she was passed out.

Various Jailers testified that they walked by Decedent Allison's cell approximately every thirty minutes at least to check on her, including to make sure that she was still breathing. For example, Jailer Leffel testified that Decedent Allison appeared to be fine at one point, by which she meant Decedent Allison was breathing and snoring.

At approximately 9 PM, Decedent Allison's husband went to the Jail and asked to speak with his wife. The husband appeared concerned and had brought Decedent Allison's medication with him. He told Jailer Dean that he believed that Decedent Allison "might have taken something," but he was not sure what. When Jailer Dean asked for more information, the husband did not provide any. Some of the Jailers attempted to rouse Decedent Allison to speak with her husband, but Allison merely moaned and mumbled; she did not fully wake up. Jailer Dean asked the husband to wait until another officer relieved him so that he and the husband could speak more, but the husband left the Jail before Jailer Dean returned.

Jailer Dean relayed his conversation with Decedent Allison's husband to Sergeant Hayes, to which Sergeant Hayes responded, "Keep a close eye on her."

---

[2] There is no relation between Decedent Allison and Jailer Allison.

Regarding these instructions, Jailer Dean later testified, "That's all we were doing to start with . . . . We already knew that information [regarding the prescription medication] from the book-in report. [The husband] wasn't telling us anything we didn't already know." In response to a question, Jailer Dean clarified that the Jail staff already had received information that Decedent Allison "might have been taking prescription medication." He stated, "We received that in the book-in packet as well as her husband stated [sic], but we did not know for a fact that she was. We're not doctors." The Jailers variably testified that they closely monitored Decedent Allison for the rest of the night in intervals of fifteen to thirty minutes.

At approximately 11:15 PM, Sergeant Hayes noticed that Decedent Allison had not changed positions in a while, and he could not tell whether she was breathing by looking into her cell. He banged on her door but received no response. He thus asked Jailer Zeller to enter the cell with him, and they tried to wake her, but were unable to do so. When Jailer Zeller noted that she had no pulse, they presumed she had died. Sergeant Hayes called his captain, as well as dispatch to call an ambulance. The ambulance arrived shortly after midnight. None of the Jailers attempted to resuscitate Decedent Allison after they discovered she had no pulse. Appellants assert that no one on the Jail staff was certified to perform cardiopulmonary resuscitation ("CPR").

The Medical Examiner's autopsy report states, "It is my opinion that Laura Janette Allison, a 54 year old white woman, died from acute ethanol intoxication. Although diazepan, in connection with ethanol can depress the respiratory drive, the levels were low and had minimal, if any, contribution to the death." The toxicology report noted .39% ethanol, .07mg/l diazepam, and .21mg/l demethyldiazpam.

In addition to the foregoing facts surrounding Decedent Allison's death at the Jail, both parties presented evidence of the Jail's policies and practices with

respect to inmates requiring medical care. Appellees assert that they have presented evidence demonstrating that: 1) there have been three deaths at the Jail since 2006; 2) there is no policy requiring medical staff onsite at the Jail at night; 3) the Jail's policy is to leave decisions about whether to contact medical personnel to the discretion of the Jailers on duty; 4) most Jailers are not trained in CPR or "basic lifesaving measures"; and 5) none of the Jailers were disciplined for failing to provide Decedent Allison with medical treatment, and the Jail has made no changes to its policies since her death. Appellants assert that they have presented evidence indicating that: 1) the Jail's policy is not to accept inmates who are so intoxicated that their health might be in danger; and 2) the Jail's policy is to obtain medical attention for any inmate who needs it.

Appellees–Decedent Allison's Estate and her two children–filed their complaint on March 2, 2011, alleging that Appellants treated Decedent Allison's serious medical needs with deliberate indifference while she was incarcerated at the Jail on public intoxication charges. Appellees named as defendants all of the Jailers who were on duty the night Decedent Allison died, as well as Sheriff Bill Wansley ("Sheriff Wansley") and Wood County, Texas ("County").[3] On April 3, 2012, Appellants moved for summary judgment, arguing that the individual defendants were entitled to qualified immunity and that the County does not have a policy, custom, or practice of treating inmates' constitutional rights with deliberate indifference. After holding a hearing, the district court denied Appellants' motion on July 3, 2012. Appellants timely filed a notice of interlocutory appeal.

## II. DISCUSSION

### A.    Jurisdiction

---

[3] The County is not a party to this appeal.

"Ordinarily, we do not have jurisdiction to review a denial of a summary judgment motion because such a decision is not final within the meaning of 28 U.S.C. § 1291." *Gobert v. Caldwell*, 463 F.3d 339, 344 (5th Cir. 2006) (quoting *Palmer v. Johnson*, 193 F.3d 346, 350 (5th Cir. 1999)). However, "[t]he denial of a motion for summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine to the extent that it turns on an issue of law." *Manis v. Lawson*, 585 F.3d 839, 842 (5th Cir. 2009) (citation and internal quotation marks omitted). Our jurisdiction on appeal is limited. We have jurisdiction to determine whether a factual dispute is material, but not whether it is genuine. *Id.* at 842-43 (citation omitted). "A district court's decision to deny qualified immunity on a motion for summary judgment is 'not appealable if [it is] based on a claim regarding the sufficiency of the evidence.'" *Gobert*, 463 F.3d at 344 (alteration in original) (citations omitted). Thus, "if the district court concludes that the summary judgment record raises a genuine issue of material fact with respect to whether . . . qualified immunity is applicable, then that decision is not immediately appealable[.]" *Id.* (citations omitted). "The scope of clearly established law and the objective reasonableness of those acts of the defendant that the district court found the plaintiff could prove at trial are legal issues we review de novo." *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 456 (5th Cir. 2001) (citations omitted).

We conclude, as a threshold matter, that we have jurisdiction to determine the materiality of the factual disputes here, and we address those factual disputes in our section entitled, "Qualified Immunity Applied Here," *infra*.

**B.    Standard of Review**

The standard of review for "an interlocutory appeal asserting qualified immunity differs from the standard employed in most appeals of summary judgment rulings." *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc). We accept the plaintiffs' version of events as true and examine "only

whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Id.* at 348 (citations omitted). We review this question de novo. *Id.* at 349.

## C.     Qualified Immunity

Generally, government officials performing discretionary functions have qualified immunity, which shields against civil damages liability, so long as their actions reasonably could have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Gobert*, 463 F.3d at 345 (citation omitted). To determine whether defendants are entitled to qualified immunity, we ask:  (1) whether the facts, taken in the light most favorable to the party asserting the injury, show that the defendants' conduct violated a constitutional right, and (2) whether the right violated was clearly established at the time of the defendants' alleged conduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236) (other citations omitted). While it is often appropriate to answer these two questions sequentially, courts are allowed to exercise their "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

"'Clearly established' means that the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Thompson*, 245 F.3d at 457 (quoting *Anderson*, 483 U.S. at 640). "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Id.* (citations omitted).  The "defendant's circumstances" includes facts that the defendant knows.  *Id.*

9

"However, because qualified immunity turns only upon the *objective* reasonableness of the defendant's acts, a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity." *Id.* (citations omitted). "An official is eligible for qualified immunity even if the official violated another's constitutional rights." *Id.* (citations omitted). "The Supreme Court has characterized the doctrine [of qualified immunity] as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citation omitted).

**D.     Constitutional Right to Reasonable Medical Care**

Pretrial detainees have a constitutional right not to have confining officials treat their serious medical needs with deliberate indifference, under the Due Process Clause of the Fourteenth Amendment. *See Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000) ("Unlike convicted prisoners, whose rights to constitutional essentials like medical care and safety are guaranteed by the Eight[h] Amendment, pretrial detainees look to the procedural and substantive due process guarantees of the Fourteenth Amendment to ensure provision of these same basic needs." (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). This right was clearly established law at the time of the incident in question.

*1.     Standards for Section 1983 Individual Liability*

Appellees have alleged that the individual officers were deliberately indifferent to Decedent Allison's serious medical need, given her cause of death–acute ethanol poisoning. "It is well-settled in the law that 'a state official's episodic act or omission, violates a pretrial detainee's due process rights to

medical care . . . if the official acts with subjective deliberate indifference to the detainee's rights.'"[4] *Id.* at 393 (citation omitted).   In order to demonstrate subjective deliberate indifference, a plaintiff must present evidence: "(1) that each defendant had subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn, (2) that each defendant actually drew that inference; and (3) that each defendant's response to the risk indicates that the [defendant] subjectively intended that harm occur." *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009) (citation and internal quotation marks omitted).   Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm. *See Hare v. City of Corinth*, 74 F.3d 633, 645, 649-50 (5th Cir. 1996) (en banc) (citations omitted).   "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

> 2.     *Standards for Section 1983 Supervisory Liability*

"Under [42 U.S.C. § 1983 ("Section 1983")], supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (citations omitted); *see also Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) (citation omitted). Where, as here, a sheriff is not personally involved in the acts that allegedly deprived the plaintiff of her constitutional rights, that sheriff is liable under Section 1983 if: "1) the sheriff failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train

---

[4] Appellees' claim against the individual defendants is properly analyzed as an "episodic act or omission" case, rather than a "condition of confinement" case.  *See Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc) ("In an 'episodic act or omission' case, an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission."). If a case falls under the "episodic act or omission" category, we apply the deliberate indifference standard.  *Id.* at 54 (citation omitted).

and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Thompson*, 245 F.3d at 459 (citations omitted).

"Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Id.* (citations omitted). Generally, the plaintiff must demonstrate at least a pattern of similar violations. *Id.* (citation omitted). Moreover, "the inadequacy of training must be obvious and obviously likely to result in a constitutional violation." *Id.* (citations omitted).

**E.    Qualified Immunity Applied Here**

*1.    Individual Jailers*

The Jailers argue that they have presented uncontroverted evidence that they did not treat Decedent Allison's serious medical needs with deliberate indifference. They further argue that, even if they did treat her medical needs with deliberate indifference, their actions were objectively reasonable. Accordingly, they argue that they are entitled to immunity from suit on this basis.

Appellees contend that the evidence illustrates that the Jailers both had "subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn" and "that each defendant actually drew that inference." *See Tamez*, 589 F.3d at 770 (citation and internal quotation marks omitted). Specifically, Appellees allege that the Jailers knew that Decedent Allison was extremely intoxicated *and* had taken prescription medication in greater dosages than necessary, a combination which could be deadly. Further, Appellees argue that the Jailers' actions prove that they actually drew this inference, in light of their frequent monitoring of Decedent Allison to ensure that she was still breathing. Appellees further argue that the genuine disputes of

fact as to both the Jailers' knowledge regarding Decedent Allison's ingestion of prescription drugs and her apparent physical condition upon arriving at the Jail preclude summary judgment in the Jailers' favor on their qualified immunity defense. The district court agreed with Appellees, concluding that the Jailers were not entitled to qualified immunity because there was "conflicting summary judgment evidence on the issue of the Defendants' knowledge regarding Allison's medical condition."

We conclude, however, that Appellees' deliberate indifference claim fails, as they present no evidence that the Jailers "subjectively intended that harm occur." *See Tamez*, 589 F.3d at 770 (citation omitted). To the contrary, the Jailers' constant monitoring of Decedent Allison and their attempts to rouse her to speak to her husband and take her medication suggest that they did *not* subjectively intend harm to befall her. "Even if those steps were 'ineffectual,' they do not demonstrate deliberate indifference." *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 554 (5th Cir. 1997); *see also Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (noting that deliberate indifference "entails something more than mere negligence"). Appellees have presented no evidence to suggest that the Jailers had this subjective intent to harm, nor evidence to suggest that they "responded with *deliberate* indifference" to a risk of serious harm. *See Hare*, 74 F.3d at 650 (emphasis added).

Further, even if Appellants treated Decedent Allison's medical needs with deliberate indifference in violation of her constitutional rights, their actions were objectively reasonable. *See Brown*, 623 F.3d at 253 ("If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'" (citation omitted)); *id.* ("Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact

for the jury."). Viewing the facts in the light most favorable to Appellees, the Jailers had knowledge that: Decedent Allison was very intoxicated, had taken prescription drugs not in accordance with directions, and had attempted to commit suicide using pills a year earlier. Specifically, with respect to the medication, the evidence demonstrates that she either took twice her normal dosage of allergy medicine, as she stated to Officer Kovic, or more vaguely, that she took the medicine "not in accordance with directions" or "not like she was supposed to." This evidence is a far cry from a suggestion that she overdosed on pills or took an unusually large amount. Moreover, Appellees have presented no evidence to indicate that Decedent Allison's physical condition exceeded anything beyond perhaps significant intoxication. Officer Barkley's probable cause affidavit states that: 1) he noticed the odor of an alcoholic beverage emitting from her breath; 2) she was confused in answering questions; 3) her speech was slurred; 4) she was unsteady on her feet; 5) she stated she had misused her prescription medications; 6) she failed a field sobriety test; and 7) she presented a danger to herself or others. On these facts, we cannot say that, by frequently monitoring Decedent Allison and allowing her to sleep, "*all* reasonable officials in the defendant[s'] circumstances would have then known that the defendant[s'] conduct violated the United States Constitution or the federal statute." *See Thompson*, 245 F.3d at 457 (citations omitted).

Indeed, it seems objectively reasonable for the Jailers to allow an intoxicated inmate to "sleep it off," with periodic monitoring to safeguard her well-being. As the Fourth Circuit aptly has stated:

> [The deceased inmate's] symptoms hardly distinguish him from the multitude of drug and alcohol abusers the police deal with everyday. [The deceased inmate] was found in possession of drugs while acting irrationally and slurring his speech. However, an officer could hardly be faulted under [*Estelle v. Gamble*, 429 U.S. 97 (1976)] for believing that [the deceased inmate] needed

14

> nothing so much as to sleep it off. To accept appellant's claim would be to mandate as a matter of constitutional law that officers take all criminal suspects under the influence of drugs or alcohol to hospital emergency rooms rather than detention centers. That would be a startling step to take.

*Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999). While the result here was tragic, we cannot say that all, or even most, reasonable officers would not have done the same, absent an inmate's additional external manifestations of medical distress.

We note that the district court here ruled that the existence of factual disputes precluded a finding that the Jailers were entitled to qualified immunity. Accordingly, we emphasize our conclusion, on the basis of the *materiality* of those disputed facts in the light most favorable to Appellees, that the Jailers here are entitled to qualified immunity. *See Manis*, 585 F.3d at 842 (citation omitted) ("Where . . . the district court finds that genuinely disputed, material fact issues preclude a qualified immunity determination, this court can review only their materiality, not their genuineness."). We therefore reverse the district court's denial of qualified immunity for the individual Jailers.

###### 2.    *Sheriff Wansley*

Appellees assert that they have presented evidence demonstrating that: 1) there have been three deaths at the Jail since 2006; 2) there is no policy requiring medical staff onsite at the Jail at night; 3) the Jail's policy is to leave decisions about whether to contact medical personnel to the discretion of the Jailers on duty (who are ill-equipped to make this determination); 4) most Jailers are not trained in CPR or "basic lifesaving measures"; and 5) none of the Jailers were disciplined for failing to provide Decedent Allison with medical treatment, and the Jail has made no changes to its policies since her death. Appellants argue that they have presented evidence indicating that: 1) the Jail's

policy is not to accept inmates who are so intoxicated that their health might be in danger; and 2) the Jail's policy is to obtain medical attention for any inmate who needs it.

The district court concluded that if the Jailers were adequately trained and yet they were deliberately indifferent to Decedent Allison's serious medical needs, then the Jailers "are at fault" for ignoring their training. The court further stated:

> However, if defendants did not know of Allison's condition or need for medical care, then fact issues remain as to: (1) the adequacy of Wansley's training regarding recognizing a serious medical need; (2) his implementation of Wood County's policies of not providing medical personnel on site at night who are able to recognize that need; and (3) whether an inadequacy amounted to deliberate indifference.

We conclude, however, that Appellees have failed to demonstrate that Sheriff Wansley was deliberately indifferent to his responsibility to train his staff. To the contrary, the uncontroverted evidence in the record illustrates that the Jailers receive training on obtaining medical assistance for any inmate when needed, and that the Sheriff has promulgated this policy. Further, "[p]roof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Thompson*, 245 F.3d at 459 (citations omitted). The three jail deaths in the record–for unrelated or unknown reasons–do not evidence such a pattern. Moreover, Appellees fail to demonstrate how the Sheriff's policies were inadequate. *See id.* at 459 (citations omitted) (noting that "the inadequacy of training must be obvious and obviously likely to result in a constitutional violation"). As Appellees fail to carry their burden, we conclude that Sheriff Wansley is entitled to qualified immunity.

### III. CONCLUSION

No. 12-40749

Based on the foregoing, we REVERSE the district court's denial of summary judgment to Appellants on their qualified immunity defense, and we REMAND for further proceedings not inconsistent with this opinion.