# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-40982

United States Court of Appeals
Fifth Circuit

**FILED**
November 25, 2019

Lyle W. Cayce
Clerk

TOMAS GARZA,
Administrator of the Estate of Ramona Reyna Rodriguez De Garza,

Plaintiff–Appellant,

versus

FIDENCIO BRIONES; EMMANUEL DIAZ; WALTER GONZALEZ;
EDUARDO GUAJARDO, III; CHRISTOPHER MARTINEZ;
SANTIAGO MARTINEZ,

Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before OWEN, Chief Judge, JONES and SMITH, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Fidencio Briones, Emmanuel Diaz, Walter Gonzalez, Eduardo Guajardo, Christopher Martinez, and Santiago Martinez—all officers of the Laredo Police Department—fired shots in an incident in which Jose Garza ("Garza") was killed. His administrator sued them under 42 U.S.C. § 1983, alleging, *inter*

No. 18-40982

*alia*, that they had used excessive force. The district court granted summary judgment to defendants, finding that they were entitled to qualified immunity ("QI"). We affirm.

I.

At about 1:43 a.m. on August 14, 2014, several officers, including defendants, responded to a 911 call from a truck stop. The caller informed the officers that a man—later identified as Garza—was sitting alone in front of the truck stop's bar playing with a pistol and holding what appeared to be a wine bottle and a plastic bag.

Santiago Martinez arrived first on the scene and observed Garza holding a black handgun. Martinez drew his service weapon, slowly advanced toward Garza, and repeatedly ordered him to drop the gun. Garza did not do so and instead continued to move the firearm around in different directions while making facial gestures at Martinez. At that time, Garza did not have his finger on the trigger and was not pointing the gun at anyone. Martinez took cover, readied his rifle, and radioed the other responding officers to advise them of the situation.

Shortly thereafter, several other officers—including the remaining defendants—arrived. They observed Martinez continue to give Garza commands to put down the firearm. Garza still did not comply.[1] The remaining officers took cover, forming a semi-circle around Garza with their weapons drawn. Several patrol vehicles had their lights flashing.

At 1:49 a.m., Julio Gonzalez ("Gonzalez") approached Estaban Martinez ("Estaban"), a private citizen completing a "ride along" with Guajardo.

---

[1] Garza may have been wearing headphones and listening to music during the encounter, but defendants did not observe that.

No. 18-40982

Gonzalez was a security guard at the truck stop but was dressed in shorts and a sleeveless T-shirt. Estaban directed Gonzalez to a nearby officer, Lieutenant Gabriel Rodman. Gonzalez told Rodman that Garza's pistol was actually a BB gun, which Gonzalez knew because he had held the gun earlier that day. Rodman did not communicate that information to the other officers because he was not able to verify it. Defendants did not speak to Gonzalez, and all believed that Garza's gun was a real firearm.

At 1:50 a.m., Garza raised his weapon and pointed it in Santiago Martinez's direction. Martinez yelled at Garza to stop, but he did not do so. Martinez fired his weapon at Garza. The other defendants, fearing that Garza was shooting at Martinez, also fired. They continued to fire until Garza fell to the ground and stopped moving. The shooting lasted about eight seconds. Each defendant fired at least one shot, and sixty-one shots were fired in total. Eighteen shots struck Garza, who died from his wounds.

Plaintiff, as Garza's administrator, brought a § 1983 claim alleging, *inter alia*, that defendants had used excessive force. Defendants moved for summary judgment, asserting QI, claiming they had committed no constitutional violation. The district court, accepting the magistrate judge's recommendation, granted summary judgment. Plaintiff appealed.

## II.

When reviewing a summary judgment, "we view the facts in the light most favorable to the [nonmoving] party and draw all reasonable inferences in its favor." *Salazar-Limon v. City of Hous.*, 826 F.3d 272, 274–75 (5th Cir. 2016) (internal quotation marks omitted). We need not accept a plaintiff's version of the facts "for purposes of [QI] when it is 'blatantly contradicted' and 'utterly discredited' by video recordings." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir.

No. 18-40982

2017) (citation and quotation marks omitted). "[W]e do not . . . assume that the nonmoving party could or would prove the necessary facts to survive summary judgment." *Salazar-Limon*, 826 F.3d at 277 (internal quotation marks omitted).

"A [QI] defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once a defendant properly invokes [QI], the plaintiff bears the burden of proving that the defendant is not entitled to the doctrine's protection." *Howell v. Town of Ball*, 827 F.3d 515, 525 (5th Cir. 2016). "To defeat [QI], the plaintiff must show that the official's conduct was objectively unreasonable in light of a clearly established rule of law." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). That is a significant hurdle: QI protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam). "[QI] gives government officials breathing room to make reasonable but mistaken judgments. . . ." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

Courts employ a familiar two-part test. Government officials "are entitled to qualified immunity . . . unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). Defendants contend that their actions represented a reasonable use of force under the circumstances that did not violate the Fourth Amendment.

## III.

Excessive-force claims are "governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). "[A] plaintiff must show (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was

clearly unreasonable." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (internal quotation marks omitted). "Excessive force claims are necessarily fact-intensive": What is excessive in one case may be permissible in another. *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam).

Excessive-force claims ordinarily examine the "totality of the circumstances" to determine whether an officer's actions were objectively unreasonable. *Rockwell v. Brown*, 664 F.3d 985, 991–92 (5th Cir. 2011). But "[w]hen an officer uses deadly force, our 'objective reasonableness' balancing test is constrained." *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004). "The use of deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (internal quotation marks omitted).

"[W]e look at the case from the perspective of a reasonable officer on the scene, paying careful attention to the facts and circumstances of each particular case." *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018) (internal quotation marks omitted). We "consider[] only the facts that were knowable to the defendant officers" at the time. *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam). And we are careful to avoid "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam).

The first element is easily satisfied: It is undisputed that defendants shot and killed Garza. But plaintiff cannot establish either of the remaining elements because the evidence indicates that the use of force was justified under the circumstances.

No. 18-40982

A.

The reasonableness of deadly force is measured "at the time of the incident." *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 490 (5th Cir. 2001) (emphasis omitted). Even though Garza was holding only a BB gun, that wasn't evident to defendants in the moment: The gun's appearance was almost indistinguishable from a handgun. Just before the shooting, Garza was behaving erratically, refusing to comply with direct police orders, and waving around what the officers presumed to be a deadly weapon. The video evidence from the dashcams of two patrol vehicles confirms that, just before defendants fired, Garza raised the gun above the tabletop, pointed the barrel in Martinez's direction, and lowered his eyeline seemingly to aim the firearm.[2] It was then that Martinez fired his weapon, and the others fired only after they heard a gunshot.

Based on those facts—which suggest that the officers thought they were confronting an unpredictable man armed with a dangerous weapon—defendants had probable cause to conclude that Garza posed them a serious threat of physical injury or death. Police officers may use deadly force in those circumstances without violating the Fourth Amendment.[3]

---

[2] That video evidence is due greater weight than are the parties' competing declarations. *See Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011).

[3] *See, e.g., Royal v. Spragins*, 575 F. App'x 300, 303 (5th Cir. 2014) (per curiam) (holding that use of deadly force was not "clearly excessive or clearly unreasonable" when officers were confronted with "the threat of serious physical harm posed by a suicidal man pointing his gun at them"); *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (holding that officer had "probable cause to believe that the suspect pose[d] a threat of serious physical harm" when the suspect was holding a handgun, even though the suspect never pointed it at the officer); *Ballard v. Burton*, 444 F.3d 391, 402–03 (5th Cir. 2006) (holding that officer could have reasonably believed suspect posed "a threat of serious harm to himself or to other officers" when suspect "refused to put down his rifle, discharged the rifle into the air several times while near officers, and pointed it in the general direction of law enforcement officers"); *Stroik v. Ponseti*, 35 F.3d 155, 159 (5th Cir. 1994) (holding that officer "could have reasonably believed that the suspects posed an imminent, deadly threat" because one of the suspects was

No. 18-40982

The interaction between Gonzalez and Rodman doesn't change that calculus. Even though Gonzalez told Rodman that Garza was holding a BB gun, Rodman did not communicate that information to the other officers because he was not able to verify or corroborate Gonzalez's account. That makes sense. The stakes were high should Gonzalez prove to be incorrect—Rodman's mistakenly notifying his colleagues that Garza's gun was only a BB gun could greatly increase the dangerousness, or even deadliness, of the encounter. And Rodman's failure to corroborate the information is understandable, given that less than a minute passed between when Gonzalez first approached him and when the shooting began.

B.

Plaintiff maintains that "the district court erred in weighing the evidence . . . rather than only determining whether there are genuine issues of fact." Specifically, plaintiff suggests four factual disputes material to QI: (1) whether Garza pointed his gun at Martinez or the other officers; (2) whether defendants were aware that Garza was wearing headphones—and therefore was unable to hear the officers' commands—when he was shot; (3) whether it was reasonable for defendants to believe that Garza had fired at Martinez; and (4) whether the sixty-one shots fired, themselves, made defendants' use of force excessive. But disputes as to those facts cannot prevent summary judgment.[4]

---

pointing a gun at him).

[4] Plaintiff also claims that the district court failed properly to apply the Fourth Amendment's "totality-of-the-circumstances" test because "[t]he totality of the circumstances shows that Garza did not threaten anyone, did not run or hide from the police, and that the most serious offense that Defendants[] observed was unlawful carrying of a weapon, a misdemeanor offense." That contention is meritless for three reasons.

First, those additional facts do not change the facts material to the use of deadly force, namely that Garza did not respond to commands to drop his weapon and pointed his raised gun at Martinez.

No. 18-40982

1.

First, plaintiff contends that a reasonable jury could find that Garza never pointed his gun at the officers and was, instead, merely drinking alcohol and playing with a gun. Plaintiff relies on three threads of evidence: (1) affidavits submitted by defendants Santiago Martinez, Christopher Martinez, and Walter Gonzalez purportedly offering inconsistent details of the shooting; (2) a series of still photos taken from dashcam footage showing that Garza's gun was not raised or pointed at defendants; and (3) Gonzalez's affidavit and written statement declaring that Garza never pointed his gun at the officers. That evidence cannot do the work plaintiff requires of it.

In parsing the affidavits, plaintiff points out that (1) Santiago Martinez stated "that he saw Garza raise the 'weapon' towards him and then immediately drop his hand"; (2) "Christopher Martinez [ ] described seeing Garza raising and twirling the gun"; and (3) "Walter Gonzalez stated that he saw Garza 'hold the weapon on top of the table and then reposition it below the table.'" Those "inconsistencies" are illusory. Each statement pertains only to the moments after each officer arrived at the truck stop. It makes sense that each officer's story would differ slightly; they arrived at different points in the encounter. But crucially, and without exception, defendants all maintain that Garza later raised his weapon and pointed it in Santiago Martinez's direction. It was not until then that defendants fired on Garza.

---

Second, that Garza did not run or hide from defendants does not mean that their use of force was objectively unreasonable. Flight is not a necessary condition to use deadly force. *See Fraire v. City of Arlington*, 957 F.2d 1268, 1280 (5th Cir. 1992).

And third, plaintiff mistakenly equates "misdemeanor" with "not serious." This court has held that driving under the influence—also a misdemeanor offense—"is a serious offense" for purposes of evaluating whether a police officer's use of force was excessive. *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016). If driving under the influence is a serious offense, it stands to reason that unlawfully carrying a firearm is too.

No. 18-40982

Plaintiff's reliance on the still photos and Gonzalez's account is similarly misplaced. Both are directly contradicted by dashcam footage confirming defendants' account. Gonzalez's statements that Garza "did not at any time point the gun to cops" and that "the gun was pointing down when he picked up his hand and the first shot was fired" cannot alter what's on the videos.[5] But even if the video didn't directly contradict Gonzalez's statement, his account would still not create a genuine dispute as to a material fact. A reasonable officer in any of the defendants' shoes would have believed that Garza posed a serious threat regardless of the direction that Garza was pointing his gun just before he was shot. *See Ballard*, 444 F.3d at 403.

2.

Second, plaintiff avers that defendants' use of deadly force was objectively unreasonable because Garza was unable to hear defendants' commands to drop his gun. To support that, plaintiff relies on Gonzalez's statements that Garza "could not understand what the cops were saying" because he "had headphones on and was listening to music during the entire time that the police were there."

That assertion fails to recognize that the relevant inquiry is not why, subjectively, Garza did not comply but whether defendants' view that Garza posed a threat of serious physical harm was objectively reasonable. *See Manis*, 585 F.3d at 845. Even if Garza could not hear the officers, it can't reasonably be suggested that he wasn't aware of their presence; more than a dozen officers with their firearms drawn and squad cars with lights flashing were surrounding him. Regardless of why Garza was noncompliant, defendants could

---

[5] Because plaintiff's version of events is definitively contradicted by video evidence, we need not accept it. *See Hanks*, 853 F.3d at 744.

justifiably conclude that his noncompliance was a threat to their safety.

Furthermore, the record is devoid of any evidence that defendants were aware that Garza was wearing headphones. "Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam). Irrelevant facts are "not outcome determinative," and a motion for summary judgment may be granted "immaterial factual disputes notwithstanding." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991).

3.

Third, plaintiff maintains that a jury could find that firing on Garza was objectively unreasonable because defendants couldn't have known that Garza fired a shot. Plaintiff posits that the lack of a "muzzle flash" from Garza's gun—coupled with the fact that defendants were all armed—suggests that it was unreasonable for defendants to infer, just from the sound of gunfire, that Garza posed them a threat.

Plaintiff's theory fails to provide adequate deference to defendants' snap judgment, in the heat of a perilous and rapidly evolving situation, about the danger Garza posed. *See Ryburn*, 565 U.S. at 477. Plaintiff points to no authority suggesting that defendants were required to wait to return fire until they could determine that Garza, and not Martinez, had fired the first shot. That is unsurprising. "[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."[6]

---

[6] *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) (cited favorably in *Mullenix v. Luna*, 136 S. Ct. 305, 311–12 (2015) (per curiam)).

No. 18-40982

4.

Fourth, and finally, plaintiff avers "that the sheer number of shots fired" and "the number of times that Garza was hit by gun fire" are enough, by themselves, to render defendants' use of deadly force objectively unreasonable. Plaintiff suggests that "[n]o reasonable officer in the same circumstances as Defendants[] could have believed that it was lawful to fire such a high number of shots."

Plaintiff's position is wholly undercut by *Plumhoff*. In *Plumhoff*, 572 U.S. at 777, police officers fired fifteen shots in ten seconds to prevent a suspect from fleeing in his car. The petitioner contended that the sheer number of shots rendered the force used excessive. *Id*. The Supreme Court rejected that position, instead stating that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id*. Defendants stopped firing when Garza fell to the ground and was no longer a threat. That they fired sixty-one shots in eight seconds, standing alone, does not render their use of force objectively unreasonable.

\* \* \* \*

In sum, the evidence on which plaintiff relies does not raise a genuine dispute as to any fact material to whether defendants' use of deadly force violated Garza's Fourth Amendment rights. Because defendants are entitled to QI, the summary judgment is AFFIRMED.

11