# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 21, 2021

Lyle W. Cayce
Clerk

No. 20-50425

Inessa G. Batyukova,

*Plaintiff—Appellant*,

*versus*

Brandon Lee Doege, #1282,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:19-CV-391

Before Davis, Southwick, and Costa, *Circuit Judges*.
Leslie H. Southwick, *Circuit Judge*:

Inessa Batyukova appeals from the district court's grant of qualified immunity and summary judgment to an off-duty sheriff's deputy on her Section 1983 claims. The deputy had been driving his own vehicle when he encountered another vehicle stopped in a traffic lane of a four-lane divided highway. Batyukova emerged from the stopped vehicle and would not follow the deputy's commands. She brought suit for the deputy's use of deadly force when he perceived she might be reaching for a weapon, and for his alleged failure to provide her medical assistance for the injuries she sustained. We AFFIRM the grant of qualified immunity and summary judgment.

No. 20-50425

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Brandon Doege was a deputy of the Bexar County, Texas Sheriff's Office who worked in the county's adult-detention center. He was not a patrol officer and had not undergone the same training as patrol officers. He was, though, commissioned as a peace officer and had received basic training for that role.

Shortly before midnight on June 28, 2018, Deputy Doege was driving westbound on U.S. Highway 90 on his way home from a shift. He was in his uniform and driving his personal vehicle, which was equipped with red and blue police-style lights. After he crossed the line from Bexar County into Medina County, Deputy Doege encountered Batyukova's vehicle stopped in the left-hand lane of the highway. Deputy Doege activated his red and blue lights and parked behind her so he could render aid. At that time, he called 911 and informed the Medina County dispatcher that he was an off-duty deputy, that he had encountered a vehicle in the middle of the road with its hazard lights on, that he was in his personal vehicle with red and blue lights, and that he had not yet approached the vehicle.

Batyukova then began to exit her vehicle. Deputy Doege opened his door and yelled out to Batyukova, "let me see your hands" and "get out of the vehicle." She stepped out of the vehicle, which prompted Deputy Doege to yell "put your hands on the hood." Instead of complying with the commands, Batyukova gave Deputy Doege the middle finger, shouted "f\*\*k

---

[1] The summary-judgment record includes: (1) a composite of the audio from Deputy Doege's 911 call with video from a nearby security camera; (2) excerpts from Deputy Doege's deposition; (3) excerpts from Batyukova's deposition; (4) an audio recording of Batyukova's interview with the Medina County Sheriff's Office; (5) the Medina County Sheriff's Office Incident Report; (6) Batyukova's deemed admissions; (7) a news article; and (8) Batyukova's medical records. The security-camera video is of poor quality, revealing little that is helpful regarding the few disputed events.

you," and said that she hated America.  Still on the line with 911, Deputy Doege asked the dispatcher to send a police unit.

It is undisputed that, over the course of the short encounter, Batyukova yelled "f**k you," "f**k America," and "I hate America."  The parties dispute whether Batyukova also said "death to America" and "you're going to f**king die tonight."  Deputy Doege testified that Batyukova made those statements and that they contributed to his fearing for his life, but Batyukova denies doing so.

After requesting a police unit, Deputy Doege again yelled "put your hands on the hood."  He also asked her "what is going on" as she continued to shout expletives.  After ignoring almost every command Deputy Doege gave, Batyukova began to walk towards Deputy Doege's vehicle.  Deputy Doege quickly put his vehicle in reverse and backed up to maintain distance.

Batyukova stopped her approach when Deputy Doege exited his vehicle and drew his weapon.  Standing behind his door, Deputy Doege yelled "get down now" and "let me see your hands."  At that point, with a cigarette in one hand, Batyukova reached her other hand towards the waistband of her pants.  Her hand went behind her back and disappeared from Deputy Doege's view.  An instant later, Deputy Doege fired five shots.  Bullets struck her wrist, leg, and abdomen.

The video evidence shows that, immediately after shooting, Deputy Doege told the dispatcher "shots fired, shots fired . . . she reached behind her back."  In his deposition, he testified that it was the combination of her saying "you're going to f**king die tonight" and her hand reaching behind her back towards her waistband that made him fear for his life.  According to his statement to the Medina County Sheriff's Office, when Batyukova "reached behind her towards her waistband," Deputy Doege "thought she was reaching for a weapon to kill [him]" and "was in fear for [his] life."

No. 20-50425

After the incident, Batyukova told news reporters that she was attempting to "moon" Deputy Doege. Similarly, she told Medina County investigators that she was attempting to show Deputy Doege her "beautiful a**." In her deposition nearly two years later, she contradicted her previous accounts and claimed that she never attempted to moon Deputy Doege. Regardless, it is conclusively established by deemed admission that Batyukova "reached toward[s] [her] waistband because [she] intended to lower [her] pants in order to display [her] buttocks to Deputy Doege."

Other undisputed facts are that after Deputy Doege shot Batyukova, he immediately informed the dispatcher that shots had been fired, that Batyukova was injured, and that he needed assistance. He told the dispatcher "I need someone now" and "she is not moving." The dispatcher responded that "units are on their way."

A few seconds later, Batyukova's vehicle horn began to blare, which caused Deputy Doege to believe someone else was in the vehicle. Deputy Doege approached her vehicle to check for others but did not see anyone inside the vehicle or in the nearby median.

Deputy Doege returned to his vehicle to search for a first aid kit but soon remembered that he did not have one with him. While he was behind his vehicle, Batyukova began to move slightly. Her movements prompted Deputy Doege to order her again to show her hands. A few moments later, officers from the Medina County Sheriff's Office and the Castroville Police Department arrived. Deputy Doege told them he had not fully cleared the vehicle, the surrounding area, or Batyukova. Other officers apparently handled traffic control, and Deputy Doege and a Medina County deputy proceeded to check Batyukova's vehicle again but found nobody else. The Medina County deputy then approached Batyukova, determined that she was breathing and responsive, and stayed with her until EMS arrived. EMS

4

arrived about 15 minutes after she was shot. Batyukova had several gunshot wounds, a fractured wrist, and an exposed bone. She had also lost approximately 1,500 mL of blood. She survived her wounds.

Batyukova brought suit against Deputy Doege under 42 U.S.C. § 1983. She then amended her complaint to add several defendants — including both Bexar and Medina Counties and their sheriff departments — and new factual allegations and claims. The district court eventually dismissed her claims against every other defendant, which left only Deputy Doege. Her claims against Deputy Doege included: (1) Fourth Amendment excessive force based on pointing his weapon at her; (2) Fourth Amendment excessive force based on shooting her; (3) First Amendment retaliation for shooting her in response to her engagement in protected activity; and (4) Fourteenth Amendment deliberate indifference for failing to render adequate medical assistance.

During discovery, Batyukova failed to respond to Deputy Doege's first set of requests for admission within the 30-day deadline set by Federal Rule of Civil Procedure 36(a)(3). After discovery closed, Deputy Doege filed a motion for summary judgment that asserted qualified immunity. His motion relied on many of the facts deemed admitted by Batyukova's failure to respond to the admission requests in a timely manner. The next day, Batyukova filed her own motion for summary judgment on one of her excessive-force claims and finally produced responses to Deputy Doege's discovery requests. Two weeks later, Batyukova moved for leave to amend her discovery responses, *i.e.*, to withdraw her deemed admissions. The magistrate denied the motion.

The district court granted Deputy Doege's motion for summary judgment. Relying in large part on the deemed-admitted facts, the court

No. 20-50425

found no Fourth, First, or Fourteenth Amendment violations.[2]  It did not analyze whether the law was clearly established for any of her claims. Batyukova timely appealed.

DISCUSSION

"We review a grant of summary judgment *de novo*, applying the same standard as the district court." *Valderas v. City of Lubbock*, 937 F.3d 384, 388 (5th Cir. 2019).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020).  "A fact is material if its resolution could affect the outcome of the action." *Id.* at 379 (quotation marks omitted).

On appeal from summary judgment, we view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Joseph v. Bartlett*, 981 F.3d 319, 325 (5th Cir. 2020). "Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation" will not survive summary judgment.  *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016). Whenever possible, we will "give greater weight . . . to the facts evident from video recordings." *Valderas*, 937 F.3d at 388.  However, the facts deemed admitted by Batyukova's failure to respond in a timely manner "are

---

[2] The district court combined Batyukova's two Fourth Amendment claims.  On appeal, Batyukova does not contest summary judgment on her claim based on Deputy Doege pointing his weapon at her.  She therefore waives appellate review of that claim. *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 653 (5th Cir. 2004).

conclusive as to the matters admitted." *In re Carney*, 258 F.3d 415, 420 (5th Cir. 2001). Those facts "cannot be overcome" at the summary-judgment stage by pointing to contradictory evidence. *Id.*

The defense of qualified immunity "alters the usual summary judgment burden of proof." *Valderas*, 937 F.3d at 389. Once a defendant properly raises the defense, the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense's protection. *Garza v. Briones*, 943 F.3d 740, 744 (5th Cir. 2019). An officer is entitled to qualified immunity if the officer's conduct either did not violate a federal right of the plaintiff or that right was not clearly established at the time of the relevant events. *Dyer*, 964 F.3d at 380. We can base a decision to allow the immunity on either part of the analysis alone. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). The district court reached only the issue of whether any constitutional violation occurred. Because we review the grant of a summary judgment using the same standards as the district court, *Valderas*, 937 F.3d at 388, we can and do resolve the appeal of Batyukova's excessive-force claim based on the other qualified-immunity consideration: whether the law was clearly established that the deputy's actions violated Batyukova's Fourth Amendment right to be free from excessive force.[3]

## I.    *Fourth Amendment excessive force*

Batyukova's excessive-force claim "is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). An officer violates the right to be free from excessive force

---

[3] No questions have been raised in this case regarding the possible effect on the usual analysis of qualified immunity of the fact that the deputy was off duty, was employed at a detention facility, and may not have been trained to make traffic stops, to decide whether to detain individuals, or to respond to firearms-based emergencies. In light of such questions not being posed, we do not answer them today.

"when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force." *Joseph*, 981 F.3d at 332. We conduct a "'necessarily fact-intensive' and case-specific inquiry." *Id.* (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012)).

The reasonableness of an officer's use of force "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This usually includes consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* In cases involving the use of deadly force, though, "our 'objective reasonableness' balancing test is constrained." *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004). "The use of deadly force violates the Fourth Amendment unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). Stated differently, "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

"[W]e are careful to avoid 'second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.'" *Garza*, 943 F.3d at 745 (quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

No. 20-50425

In this case, Batyukova's deemed admissions conclusively establish the following facts. She ignored Deputy Doege's commands to show her hands and to place her hands on the hood of her vehicle. Instead, she gave him the middle finger and shouted expletives at him. She then started walking towards Deputy Doege, which prompted him to reverse his vehicle to maintain distance. She failed to comply with his subsequent command to "get down." Then, Batyukova reached for her waistband.

Other uncontroverted summary-judgment evidence shows that Deputy Doege observed Batyukova reach behind her back, that her hand disappeared from view, and that Deputy Doege feared that she was reaching for a weapon.[4]

The district court determined that "a reasonable officer in Doege's position would have believed Batyukova posed an immediate threat to his safety" and that his "decision to use deadly force was objectively reasonable under the circumstances." The court concluded that Batyukova failed to demonstrate a Fourth Amendment violation, a conclusion that resulted in the grant of qualified immunity without needing to consider whether the law supporting a violation was clearly established.

We resolve the appeal of Batyukova's excessive-force claim on whether the right she claims was clearly established at the time of the alleged misconduct. *See Dyer*, 964 F.3d at 380. Batyukova must show that the law was "sufficiently clear" at that time "that every reasonable official would

---

[4] Although Batyukova testified that she never attempted to moon Deputy Doege, her deemed admissions and her own statements to investigators and reporters said otherwise. Regardless, she has not argued in this appeal that her hand never went behind her back or disappeared from view. Accordingly, she has not genuinely disputed Deputy Doege's testimony that she reached behind her back and that her hand disappeared from his view. Her undisputed reach "towards her waistband" mandates the same result.

9

have understood that what he [was] doing violate[d] that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). There are two ways to demonstrate clearly established law. Under the first approach, the plaintiff may "identify a case" or "body of relevant case law" in which "an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Joseph*, 981 F.3d at 330 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). This approach "do[es] not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In the excessive-force context, "officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 577 U.S. at 13).

Under the second approach, "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). As for the potential for an obvious violation of rights, Batyukova argues that all reasonable officers would have known they could not use deadly force against someone who clearly posed no threat. Because that does not describe the facts of this case, we will say no more about the category of an obvious constitutional violation.

To overcome qualified immunity in this case, Batyukova must show that clearly established law prohibited using deadly force against a person who (1) repeatedly ignored commands, such as to show her hands, to place her hands on the hood of her vehicle, or to get down; and then (2) reached her hand behind her back towards her waistband, which the officer perceived to be a reach for a weapon to use against him.

Batyukova discusses quite a few precedents. We will discuss the significant ones in groups of somewhat-similar fact patterns.

### 1.    *Force against suspects not resisting or attempting to flee*

Our first group of precedents includes those in which this court recognized that officers violate the Fourth Amendment when they tase, slam, or strike suspects or arrestees who are not actively resisting arrest or attempting to flee. In one, officers executing an arrest warrant threw a suspect to the ground, tased him twice, choked him, punched and kicked him, pressed his face into the ground, and pulled his hands behind his back to handcuff him. *Darden v. City of Fort Worth*, 880 F.3d 722, 725 (5th Cir. 2018). The evidence was that the suspect had complied with the officers' orders and never resisted arrest. *Id.* at 731. We held that "it was clearly established that violently slamming or striking a suspect who is not actively resisting arrest constitutes excessive use of force." *Id.* at 733. Similarly, in the precedent on which the *Darden* court relied, we held that it violated clearly established law to "forcefully slam [an arrestee's] face into a vehicle while she was restrained and subdued." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008). The evidence viewed in the light most favorable to the plaintiff in *Bush* showed that "she was not resisting arrest or attempting to flee." *Id.*

Neither *Darden* nor *Bush* clearly establish a constitutional violation in this case. Those cases did not involve, as this case does, an adversarial and non-compliant person's reach for what might have been a weapon.

### 2.    *Deadly force against someone not posing an imminent threat*

Batyukova also asserts substantial similarity of the facts here with a precedent in which, after a 12-minute encounter, deputies shot and killed a knife-wielding suspect who was 30 feet away from everyone and standing in a surrender pose. *Amador v. Vasquez*, 961 F.3d 721, 724–26 (5th Cir. 2020). We held that at the time of the 2015 encounter, "[e]very reasonable officer

would have understood that using deadly force on a man holding a knife, but standing nearly thirty feet from the deputies, motionless, and with his hands in the air for several seconds, would violate the Fourth Amendment." *Id.* at 730.

*Amador* does not clearly establish a constitutional violation in this case, either. It is distinguishable in two material respects. First, the suspect was wielding a knife while standing too far away to be an immediate danger. *See id.* Second, by the time the deputies in *Amador* shot, the suspect "had his hands in the air in a surrender position; and stood stationary in the officers' line of sight." *Id.* at 729. Surrender diminished, if not dispelled, the threat the suspect posed. Those facts are not comparable to the situation of Deputy Doege, who believed that Batyukova was reaching for a weapon that could endanger him, and there was no evidence of surrender.

More factually comparable are two precedents in which the use of deadly force was held to be reasonable because the officer had reason to perceive a threat of serious harm. In one, it was reasonable to use deadly force when the officer perceived a suspect's sudden reach towards his waistband "to be consistent with a suspect retrieving a weapon." *Salazar-Limon v. City of Hous.*, 826 F.3d 272, 275, 278 (5th Cir. 2016). We have also held that the use of deadly force is reasonable when a person, "in defiance of the officers' contrary orders, reached under the seat of his vehicle and appeared to retrieve an object that [one officer] reasonably believed to be a weapon." *Manis*, 585 F.3d at 845. Similarly to the facts of this case, the person in *Manis* was not suspected of criminal activity but, rather, was approached because his vehicle was idling on railroad tracks at an intersection. *Id.* at 841. Though there are factual distinctions to be made, both *Salazar-Limon* and *Manis* involved the use of deadly force following a person's reach for what reasonably could have been a weapon. In both, the use of deadly force was held to be reasonable.

### 3.      *Sudden escalation without justification*

Batyukova also cites several cases in which this court concluded that police officers violated the Fourth Amendment by quickly resorting to force without adequate justification or provocation.

In one precedent, officers struck, put in a headlock, and pulled to the ground an apparently intoxicated person who pulled his arm away from officers who were trying to grab his arm. *Trammell v. Fruge*, 868 F.3d 332, 337 (5th Cir. 2017). We held that that law was clearly established as of that time "that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp." *Id.* at 343.

In another decision, an officer performed a physical takedown on a motorist who had passively resisted the officer's commands throughout the encounter. *Hanks v. Rogers*, 853 F.3d 738, 742 (5th Cir. 2017). We held that the law was clearly established "that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation." *Id.* at 747.

Batyukova also relies on a precedent in which we held that clearly established law prohibited striking and tasing a suspect who "committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command." *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012). Pivotal to the decision was the fact that "the officers immediately resorted to [using a] taser and nightstick without attempting to use physical skill, negotiation, or even commands." *Id.* at 763.

The final precedent in this group is one in which a suspect refused to exit her vehicle during a traffic stop. *Deville v. Marcantel*, 567 F.3d 156, 161

No. 20-50425

(5th Cir. 2009).  There was evidence that the officers "engaged in very little, if any, negotiation with her — and . . . quickly resorted to breaking her driver's side window and dragging her out of the vehicle."  *Id.* at 168.  We held that "a jury could reasonably find that the *degree* of force the officers used . . . was not justifiable under the circumstances."  *Id.*

These decisions do not, individually or collectively, clearly establish a constitutional violation here.  None involved an officer using deadly force against a non-compliant individual who reaches for what might have been a weapon.  There is little factual support to say that Deputy Doege *abruptly* resorted to force.  In fact, he did not use any force against Batyukova until she initiated her reach behind her back towards her waistband, which Deputy Doege perceived to be a reach for a weapon.  "[W]e have never required officers to wait until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure their safety."  *Salazar-Limon*, 826 F.3d at 279 n.6.

### 4.    *Deadly force against a suspect without sufficient warning*

Batyukova describes the next group of precedents as ones that prohibited the "use of deadly force without warning where the suspect posed no immediate threat to the officer[] or others."

In one of those precedents, officers were searching a wooded area for a 17-year-old male reported to be walking around with a handgun.  *Cole v. Carson*, 935 F.3d 444, 448 (5th Cir. 2019) (*en banc*).  The officers found the teenager holding a gun to his head and shot him.  *Id.* at 448–49.  We held that it violated the law clearly established at that time to shoot a suicidal teenager who was armed but made no threatening or provocative gestures, posed no immediate threat of harm to them, was facing away from the officers, and was not warned even though it was feasible to do so.  *Id.* at 455.

14

No. 20-50425

That decision relied on a 1996 decision of this court. *Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996). There, after gunfire caused chaos on a crowded beach, officers found and shot a suspect sitting inside a vehicle. *Id.* at 193. We held that it violated the Fourth Amendment to shoot someone four times who took no threatening action, was not holding a gun, was not warned, and who "may have barely had an opportunity to see [the officer] before [the officer] fired his gun." *Id.* at 198. As the court explained, "[c]haos on the beach and [the suspect's] mere motion to turn and face [the officer] are not compelling reasons" to justify deadly force. *Id.* The court also explained that "[t]he number of shots and the nature of the wounds raise[d] a serious question as to the reasonableness of [the officer's] conduct." *Id.* The suspect received four gunshot wounds in areas of his body that indicated that he was not facing the officer at the time he was shot. *Id.*

Both *Cole* and *Baker* are distinguishable. Batyukova was undoubtedly aware of Deputy Doege's presence. She repeatedly ignored his commands, walked towards him, was actually facing him, and then made a movement towards her waistband as if she was reaching for a weapon to use against Deputy Doege.

Batyukova argues that no reasonable officer could have believed that it was constitutional to "us[e] deadly force, five gunshots, against an individual not suspected of a crime, who posed little to no threat to the officer or others, was not fleeing or resisting arrest, and was holding a cigarette." That is not a fair characterization of the facts. Deputy Doege made a split-second decision to use deadly force against a non-compliant person who made a movement consistent with reaching for a weapon. We cannot say that Batyukova posed "little to no threat" to Deputy Doege.

No. 20-50425

We conclude that Batyukova failed to identify clearly established law prohibiting Deputy Doege's use of deadly force. The district court's grant of summary judgment on her excessive-force claim is affirmed.

## II.    *First Amendment retaliation*

Batyukova claims that Deputy Doege shot her in retaliation for her engagement in activity protected by the First Amendment. The district court determined that Batyukova failed to show a constitutional violation.

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quoting *Hartman*, 547 U.S. at 256).

There is some uncertainty as to whether *Graham v. Connor*, 490 U.S. 386 (1989), precludes a First Amendment retaliation claim based on an officer's use of excessive force during a seizure.[5] In *Graham*, the Supreme

---

[5] District courts in our circuit have reached competing conclusions. *Compare Ybarra v. Davis*, 489 F. Supp. 3d 624, 632 (W.D. Tex. 2020) (holding that a plaintiff may bring a First Amendment claim for post-arrest retaliation that is "[s]eparate from the Fourth Amendment excessive force claim"), *with Price v. Elder*, 175 F. Supp. 3d 676, 679 (N.D. Miss. 2016) (holding "that the Fourth Amendment functions as the exclusive remedy").

We do not find clarity in out-of-circuit precedents, either. The Eighth Circuit held in one case that force applied after a plaintiff asked an officer if he had a warrant "implicate[d] the protections of the Fourth Amendment and that no cognizable § 1983 First Amendment claim ha[d] been asserted." *Anderson v. Franklin Cnty.*, 192 F.3d 1125, 1132 (8th Cir. 1999). Since then, it has allowed a First Amendment claim for retaliatory use

Court rejected the argument that excessive force could be asserted "under a 'substantive due process' approach." *Id.* at 395. In doing so, the Court explicitly held "that *all* claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* In this case, neither party has addressed whether *Graham* forecloses a First Amendment claim for retaliatory use of force. The district court did not address that possibility. We leave the question for another day because it is not necessary to our resolution of this appeal.

For a First Amendment retaliation claim, a plaintiff must demonstrate: (1) she was engaged in constitutionally protected activity; (2) the officer's action caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the officer's adverse actions were substantially motivated against her exercise of constitutionally protected activity. *Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017).

"To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves*, 139 S. Ct. at 1722 (quoting *Hartman*, 547 U.S. at 259). The officer's retaliatory motive "must *cause* the injury." *Id.* "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the

---

of force to proceed where an officer pepper sprayed a plaintiff in response to asking for the officer's badge number. *See Peterson v. Kopp*, 754 F.3d 594, 603 (8th Cir. 2014).

retaliatory motive." *Id.* A First Amendment retaliation claim fails if the "action would have been taken anyway." *Hartman*, 547 U.S. at 260.

The first two elements are not in dispute. Batyukova was engaged in protected activity during her encounter with Deputy Doege and being shot would chill a person of ordinary firmness from engaging in protected activity. Focusing on causation, the district court concluded that "Batyukova did not present evidence that her speech and expressive conduct was a but-for cause of the shooting."

The undisputed evidence shows that, during the encounter, Batyukova said "f**k you," "f**k America," and "I hate America." She also engaged in the expressive conduct of displaying her middle finger to the deputy.

The parties dispute whether Batyukova also said "death to America" and "you're going to f**king die tonight." In her deposition and in her motion for summary judgment, Batyukova denied saying either. At oral argument in this appeal, Batyukova's counsel denied any reliance on these statements for her First Amendment claim. Her counsel expressly conceded that her First Amendment claim only asserts that she was shot because she said "f**k you," "f**k America," and "I hate America," and because she gave Deputy Doege the middle finger.

On appeal from summary judgment, we are required to view the facts in the light most favorable to the nonmovant; here, Batyukova. *See Joseph*, 981 F.3d at 325. We are to analyze whether the facts alleged or shown by the plaintiff make out a claim for First Amendment retaliation. *See Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009). Accordingly, the question before us is whether any of the speech or expressive conduct that Batyukova alleges to have engaged in was a but-for cause of being shot.

In his deposition, Deputy Doege testified that he shot Batyukova because he feared for his life on account of her saying "you're going to f**king die tonight" and reaching her hand behind her back towards her waistband. At another point in his deposition, he testified that the two statements that contributed to his fears were "you're going to f**king die tonight" and "death to America." Batyukova has repeatedly denied making these statements and rejected any reliance on them during oral argument. Thus, these statements are not a component of her First Amendment claim.

There is no record evidence to support the conclusion that the protected activity Batyukova alleges she engaged in was a but-for cause of being shot. Deputy Doege testified that Batyukova saying "f**k America" did not cause him to fear. Nor did her saying "f**k you." Further, there is nothing in the record to suggest that her saying "I hate America" or giving Deputy Doege the middle finger caused him to fear for his life. As a result, Batyukova has not presented any summary-judgment evidence that her engagement in protected speech caused Deputy Doege to shoot her. She therefore cannot show that she would not have been shot absent her engagement in protected activity.

The timeline of events also supports this conclusion. Deputy Doege did not discharge his firearm at Batyukova when she began shouting expletives at him. He did not fire at Batyukova as she was walking towards him. Rather, he shot her when she reached her hand behind her back towards the waistband of her pants. The temporal gap between the protected activity on which Batyukova relies and being shot, as well as the intervening reach towards her waistband, supports the conclusion that her protected activity was not a but-for cause of being shot. Her First Amendment claim therefore fails. *Nieves*, 139 S. Ct. at 1722; *Alexander*, 854 F.3d at 308.

The district court's grant of summary judgment on Batyukova's First Amendment claim is affirmed.

### III.    *Fourteenth Amendment deliberate indifference*

Batyukova also challenges summary judgment on her Fourteenth Amendment claim for deliberate indifference to her medical needs.  The district court granted summary judgment because it found no evidence that Deputy Doege was deliberately indifferent and no evidence that she suffered harm as a result of any delay in receiving medical care.

The Due Process Clause of the Fourteenth Amendment guarantees detainees the right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials."  *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001).  This guarantee "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police."  *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 279 (5th Cir. 2015).  These protections usually apply to pretrial detainees who have been apprehended on account of criminal activity.  *See Dyer*, 964 F.3d at 380.  Deputy Doege was in his uniform, in a vehicle displaying red and blue police-style lights, identified himself to the dispatcher as an off-duty deputy, and restrained Batyukova's liberty by shooting her.  That is enough to conclude that the Fourteenth Amendment required the "confining officials" to provide reasonable medical care.  *Thompson*, 245 F.3d at 457–58; *see also Hernandez v. Tex. Dep't of Prot. & Regul. Servs.*, 380 F.3d 872, 880 & n.1 (5th Cir. 2004) (explaining that these duties fall on "state actors").

To prevail on a claim of deliberate indifference under the Fourteenth Amendment, "[t]he plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference."  *Mason*, 806 F.3d at 279 (quoting *Hill v.*

*Carroll Cnty.*, 587 F.3d 230, 238 (5th Cir. 2009)). "[The] plaintiff must show that the officials refused to treat [her], ignored [her] complaints, intentionally treated [her] incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (quotation marks omitted) (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001)). If the plaintiff relies on *delay* as the basis of the claim, then the plaintiff must show that the delay "*results in substantial harm.*" *Westfall v. Luna*, 903 F.3d 534, 551 (5th Cir. 2018). Pain suffered during that delay, though, can constitute substantial harm. *Id.*

Deputy Doege had "subjective knowledge of a substantial risk of serious medical harm." *See Mason*, 806 F.3d at 279. Deputy Doege shot Batyukova several times. Batyukova fell to the ground and lay motionless. Deputy Doege immediately requested assistance, which evinces his awareness of Batyukova's need for medical care. At issue is whether Deputy Doege responded with deliberate indifference. *See id.*

Viewing the facts in the light most favorable to Batyukova, even though Deputy Doege did not personally render medical treatment to Batyukova, he immediately informed emergency dispatch that shots had been fired, that Batyukova was injured, and that she needed assistance. We cannot say he ignored Batyukova, refused to treat her, or displayed wanton disregard for her medical needs. *See Mason*, 806 F.3d at 279.

In contrast is one of our decisions in which deliberate-indifference claims arose from officers' failure to inform jail personnel of a pretrial detainee's injuries when they delivered him to the jail. *Dyer*, 964 F.3d at 381–82. We held that a reasonable jury could find that the officers "acted with deliberate indifference by failing to seek medical attention, by failing to inform jail personnel about [the detainee's] injuries, and by informing jail personnel only that [the detainee] had been 'medically cleared' before

arriving at the jail." *Id.* at 382. Here, Deputy Doege immediately sought medical attention.

Batyukova relies on the fact that Deputy Doege did not "individually" provide medical care. Although that is true, a Medina County deputy did render aid. That deputy approached Batyukova, determined that she was breathing and responsive, and stayed with her until EMS arrived. In *Mason*, the fact that one officer "did not *personally* participate" in the rendering of medical care did not constitute deliberate indifference. 806 F.3d at 279. There, three officers responded to a reported armed robbery at an apartment, and one of the officers shot the person suspected of the robbery. *Id.* at 272–73. After the shooting, the defendant–officer called an ambulance, left the apartment to return a police canine to the patrol vehicle, and returned to find other officers addressing the suspect's wounds. *Id.* at 279. We consider the facts of *Mason* to be closely analogous. Accordingly, that Deputy Doege was not the officer personally to approach Batyukova does not amount to deliberate indifference.

The only possibly meaningful difference between *Mason* and this case is the delay between the shooting and the moment the Medina County deputy approached Batyukova. At most, the delay was 15 minutes, which is the amount of time between Batyukova being shot and EMS arriving. We acknowledge that 15 minutes appears to be a long time to be left on the ground while bleeding from gunshot wounds. It does not, however, amount to a legally cognizable claim for deliberate indifference because Batyukova has not presented any evidence that the delay resulted in "substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

There is no indication that the delay between being shot and being approached, either by the Medina County deputy or EMS, increased

No. 20-50425

Batyukova's risk of bodily harm or death.[6]  Nor is there any indication that the delay caused pain that would have been alleviated had she been approached by an on-scene deputy at an earlier time.  Further, the time taken to clear the scene, both initially and subsequently, is a "legitimate governmental objective" preventing that delay from being a basis for deliberate indifference.  *Baldwin v. Dorsey*, 964 F.3d 320, 327 (5th Cir. 2020) ("Pre-trial detainees must be provided with reasonable medical care, unless the failure to supply it is reasonably related to a legitimate government objective." (quotation marks omitted)).  Finally, EMS arrived within 15 minutes of the shooting, and there is no indication that it could have arrived any sooner.

Batyukova has not shown that Deputy Doege responded to her medical needs with deliberate indifference.

AFFIRMED.

---

[6] Batyukova cites *Estate of Baker ex rel. Baker v. Castro*, No. H-15-3495, 2018 WL 4762984 (S.D. Tex. Aug. 31, 2018).  It is distinguishable as well as non-binding.  There, after shooting a suspect, the officer did not provide any medical care, but he did handcuff the suspect after he was shot and as he was lying on his face.  *Id.* at *13.  The suspect died due to blood loss a few minutes later.  *Id.*  The court held that jury issues existed as to whether the officer was deliberately indifferent.  *Id.*  Here, though, there is no evidence that the delay between being shot and being treated by the Medina County sheriff or EMS *resulted* in substantial harm.  *Mendoza*, 989 F.2d at 195.