# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 17, 2023

Lyle W. Cayce
Clerk

―――――――

No. 22-40781

―――――――

Santos Argueta; Blanca Granado; Dora Argueta; Jelldy
Argueta; The Estate of Luis Fernando Argueta,

*Plaintiffs—Appellees*,

*versus*

Derrick S. Jaradi,

*Defendant—Appellant*.

―――――――――――――――――――――――

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:20-CV-367

―――――――――――――――――――――――

Before Clement, Haynes, and Oldham, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

On June 25, 2018, Galveston Police Officer Derrick Jaradi fatally shot
Luis Argueta, who was armed with a handgun equipped with a high-capacity
ammunition extension. Representatives of Argueta's estate[1] sued, alleging
that Jaradi used excessive force in violation of Argueta's Fourth Amendment

―――――――――――――――――――

[1] The plaintiffs include Argueta's parents—Santos and Blanca Granado—and his
sisters—Dora and Jelldy Argueta. For ease of reference, we refer to the plaintiffs
collectively as "Argueta."

rights. The district court concluded that four genuine issues of material fact preclude Jaradi's motion for summary judgment on qualified-immunity grounds. For the reasons explained below, we REVERSE and RENDER judgment in favor of Jaradi.

## I.

On June 25, 2018, Argueta and his girlfriend, Mary Ann Luna, drove to a convenience store in Galveston around 3 a.m. According to Luna, Argueta intended to buy a cigar. While Argueta was inside the store, Jaradi and his partner, Officer Matthew Larson, drove into the store's parking lot. Luna indicated that the police officers were "looking at [Argueta] like . . . something was wrong," and, when Argueta returned to the car, Luna told Argueta that the officers were "looking at [him] crazy." While Luna denies that Argueta talked to anyone in or outside the store besides a store employee, the officers indicate that Argueta spoke to a woman outside the store whom Jaradi suspected of being a prostitute. Argueta and Luna drove off shortly after the officers pulled into the parking lot. While Jaradi testified that Argueta sped off at a "really high rate of speed," Luna said that Argueta's car left "super slow[ly]."

The officers initially lost sight of Argueta's car after it left the parking lot, but later, while patrolling the area, they saw the vehicle drive through an alleyway. The officers contend that Argueta's headlights and taillights were off and that Argueta rolled through several stop signs. Around this time, Jaradi turned on the patrol car's dashboard camera ("dashcam"). By the time the dashcam video footage begins, Argueta's lights are turned on while the car was in motion. The video also indicates that the vehicle stopped, at least momentarily, at all stop signs, and moved at a moderate speed. The patrol car followed Argueta for a few blocks before the officers turned on the

emergency lights. Argueta continued driving for roughly two blocks and then pulled over.

The video shows that Argueta quickly exited the car, turned his left side towards the officers, and ran toward a vacant lot across the street. Argueta's right arm and hand were not visible in the dashcam footage because Argueta kept his right arm pressed against his side and ran in a direction where only his left side was visible to the officers; his right arm and hand were also not clearly visible in the officers' body-camera ("bodycam") footage as they were obscured, blurry, or—at times—apparently pressed down on the right side of Argueta's body. Argueta's apparent concealment of his right hand from Officer Jaradi's view—by pressing his right hand near his right hip with the core of his body between him and Jaradi—made Jaradi concerned that he could not, if necessary, react with his handgun in time to stop an attack.

Approximately five seconds after Argueta exited his vehicle, Jaradi fired two shots at Argueta, both of which struck Argueta and caused Argueta to fall to the ground. There is no audio accompanying the bodycam footage until Jaradi shoots.

Seconds later, the officers set their flashlights on Argueta, who was laying on his back in the empty lot. The bodycam footage shows a black pistol in Argueta's right hand. The officers direct Argueta to drop the weapon and roll over onto his stomach. A few seconds later, Argueta complied, revealing the gunshot wounds on his back.

Shortly after the shooting, the officers called for Emergency Medical Services and backup. Two minutes later, additional officers arrived on the scene. They handcuffed Argueta and started administering medical aid until EMS arrived and transported Argueta to the hospital. Argueta was pronounced dead at 3:42 a.m.

In June 2020, Argueta's parents and siblings, on behalf of themselves and Argueta's estate, filed a wrongful-death lawsuit against Jaradi.[2] At the close of discovery, Jaradi moved for summary judgment, arguing that Argueta could not overcome qualified immunity. The district court denied his motion, and Jaradi filed an interlocutory appeal.

## II.

Although an order denying summary judgment is normally not immediately appealable, a pretrial order denying an officer's qualified-immunity defense is subject to immediate appeal. *Plumhoff v. Rickard*, 572 U.S. 765, 771–72 (2014). We review such appeals *de novo*. *Walsh v. Hodge*, 975 F.3d 475, 481 (5th Cir. 2020). In so doing, our jurisdiction is generally limited to examining the *materiality* (*i.e.*, legal significance) of factual disputes the district court determined were genuine, not their genuineness (*i.e.*, existence). *Joseph v. Bartlett*, 981 F.3d 319, 331 (5th Cir. 2020). But an exception exists: we are permitted to review genuineness where, as here, video evidence is available. *Poole v. City of Shreveport*, 13 F.4th 420, 424 (5th Cir. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) and *Curran v. Aleshire*, 800 F.3d 656, 663–64 (5th Cir. 2015)).

## III.

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). The qualified-immunity inquiry has two parts. First, we ask whether the facts, "taken in the light most favorable to the party asserting

---

[2]Argueta also sued the City of Galveston, under a municipal-liability theory, but the district court granted summary judgment in favor of the city. That part of the summary judgment order is not subject to this appeal.

the injury, . . . show the officer's conduct violated a federal right." *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (alterations adopted) (quotation marks and citation omitted). And second, we ask "whether the right in question was 'clearly established' at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct." *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (en banc). Once an officer pleads qualified immunity, it is the plaintiff's burden to establish that the officer violated the plaintiff's clearly established federal rights. *Estate of Davis v. City of North Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005).

"This is a demanding standard." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1517 (2016). Because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs,* 475 U.S. 335, 341 (1986), we do not deny its protection unless existing precedent places the constitutional question "beyond debate," *Swanson,* 659 F.3d at 371 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)).

An officer's use of deadly force is not unreasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others. *Mace v. City of Palestine,* 333 F.3d 621, 624 (5th Cir. 2003). The reasonableness of the use of deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). In so doing, the "court must 'ask whether the law so clearly and unambiguously prohibited [the police officer's] conduct that *every* reasonable [police officer] would understand that what he is doing violates [the law].'" *Vincent*, 805 F.3d at 547 (emphasis in original) (citation omitted). "If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990).

**IV.**

Argueta pleads excessive force, a cause of action derived from the Fourth Amendment. *See Graham*, 490 U.S. at 388. An excessive-force claim requires (1) an injury, (2) resulting directly and only from excessive force, (3) that was objectively unreasonable. *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018) (citation omitted). Here, only the last element is at issue. Determining whether the force used was objectively unreasonable "requires careful attention to the facts and circumstances of [the] particular case," including "(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted).

The district court identified the following as genuine disputes of material fact that preclude summary judgment on qualified immunity:

> (1) whether Jaradi could see that Argueta held a weapon;
> (2) whether Argueta's flight posed any risk to the officers or the public;
> (3) whether Argueta raised the gun or otherwise made a threatening motion towards the officers; and
> (4) whether either officer warned Argueta before firing.

As a preliminary matter, we are not persuaded that the second "fact dispute" is a question of fact at all. Rather, as explained below, it is a legal determination that turns on *other* factual issues. Because our jurisdiction is limited to examining the materiality (and, in cases of video evidence, genuineness) of *fact disputes*, we set aside question two and review the remaining three fact disputes for genuineness and materiality.

**A.**

Because video evidence is available here, we begin by reviewing fact disputes one, three, and four—listed above—for genuineness. *Scott*, 550 U.S. at 380; *Poole*, 13 F.4th at 424.[3] We conclude that video evidence confirms the genuineness of fact disputes one and three and does not bear on fact dispute four.

In the police footage, the street is very dark, and Argueta's flight from the vehicle towards the vacant lot is illuminated only minimally by streetlight and very briefly by police flashlights. Argueta flees the vehicle in such a way that the right side of his body, including his right arm and hand, is completely hidden in the dashcam video and either obscured or not in focus in the bodycam footage. The bodycam video is not of the highest resolution and is filmed from the vantage of Jaradi's chest rather than eyes, which creates a partially obscured view of Argueta after Jaradi raises his gun. The result of the foregoing is that, from the moment Argueta exits the vehicle until the moment he is laying on the ground, not one frame of video evidence presents a clear glimpse of the firearm. Like the district court, we find that a reasonable jury could conclude that Argueta's weapon was not visible to Jaradi before or at the moment he used deadly force.

---

[3] *Scott* could be read to hold that we are empowered to review the genuineness of fact disputes *only to determine* whether video evidence "blatantly contradicts" one party's version of events. *See Scott*, 550 U.S. at 380. However, we have interpreted *Scott* more broadly, reading it as recognizing a general exception to the prohibition on interlocutory review of genuineness in cases involving video evidence. *See Poole*, 13 F.4th at 424; *Curran*, 800 F.3d at 663–64. That wrinkle does not impact the outcome of this appeal, however, because we conclude that the video evidence does not "blatantly contradict" either party's version of events for the fact disputes on which it bears, and in fact serves only to confirm the existence of such fact disputes. Thus, the result is the same whether we are agreeing with the genuineness of the fact disputes identified below after our own independent review or simply deferring to the district court's determinations of genuineness.

The same goes for "whether Argueta raised the gun or otherwise made a threatening motion towards the officers." The only action visible in the police footage is Argueta slowly driving away from the police, exiting the vehicle, and fleeing toward an empty lot. And, while the footage does show that Argueta keeps his right arm pressed against the right side of his body during flight—which, Jaradi argues, suggests Argueta was "trying to conceal his right arm and hand from the officers"—the video does not clearly reflect that Argueta showed the gun during his flight.

The second part of fact dispute three asks whether Argueta "made a threatening motion towards the officers." To the extent the district court is asking whether Argueta made any motion in the direction of the officers, the video evidence appears to confirm the existence of a fact dispute; the footage shows no such motion, so a jury would be left to determine what happened in the moments the footage is dark, blurry, or physically obscured. To the extent the court is asking whether the motions that Argueta made were threatening, however, that is a legal question and not a fact dispute. As we explain further below, an assessment of whether a suspect's physical actions amount to threatening behavior bearing on an excessive-force claim is a question of law.

Finally, the video evidence does not bear on "whether either officer warned Argueta before firing" because the dashcam video does not contain audio and neither officer's bodycam video contains any audio until the moment Jaradi fires the shots (in the Larson video) or until after the shots are fired (in the Jaradi video). Because the video evidence does not bear on the genuineness of the warning dispute, we defer to the district court's assessment, consistent with the scope of our review.

**B.**

**1.**

Next, we examine the materiality of the above-listed fact disputes, beginning with whether Jaradi could see that Argueta held a weapon.

Because a genuine dispute of fact exists as to this issue, we must take the facts in the light most favorable to Argueta and assume that Jaradi could *not* see that Argueta was armed before Jaradi used deadly force. Accordingly, each of Jaradi's cases in which a gun (or apparent gun) was visible to police prior to their use of deadly force is facially inapposite. *See, e.g.*, *Wilson v. City of Bastrop*, 26 F.4th 709, 711 (5th Cir. 2022); *Garza v. Briones*, 943 F.3d 740, 743 (5th Cir. 2019); *Ramirez v. Knoulton*, 542 F.3d 124, 126–27 (5th Cir. 2008). Instead, we must look to cases where police officers confronted an individual whose actions suggested that he or she possessed, and might in that moment access, a firearm.

In *Salazar-Limon v. City of Houston*, a police officer shot Salazar in his back after a traffic stop when the officer observed that Salazar did not comply with police commands and suddenly reached toward his waistband, which was covered by an untucked shirt. 826 F.3d 272, 275 (5th Cir. 2016). Although Salazar was later found to be unarmed, the officer—at the moment he fired—perceived Salazar's combination of movements to be consistent with Salazar retrieving a weapon from his waistband. *Id.* We held that the officer's actions were objectively reasonable, citing the following circumstances: "Salazar's resistance, intoxication, his disregard for [the officer]'s orders, the threat he and the other three men in his truck posed while unrestrained, and Salazar's actions leading up to the shooting (including suddenly *reaching towards his waistband*)." *Id.* at 279 (emphasis in original).

Similarly, in *Batyukova v. Doege*, Batyukova refused to comply with the officer's instructions, became verbally aggressive, and, instead of heeding the officer's admonition to "get down" and show her hands, reached her hand toward the waistband of her pants and behind her back. 994 F.3d 717, 722–23 (5th Cir. 2021). The deputy, believing that Batyukova was reaching for a weapon to kill him, shot her. *Id.* at 723. We affirmed the grant of summary judgment in the officer's favor, emphasizing that Batyukova, though later determined to be unarmed, "repeatedly ignored [the officer's] commands, walked towards him, was actually facing him, and then made a movement towards her waistband as if she was reaching for a weapon to use against Deputy Doege." *Id.* at 729.

Further illustrative of the "furtive gesture" line of cases: in *Manis v. Lawson*, Manis ignored police commands to show his hands and instead "reached under the seat of his vehicle and then moved as if he had obtained the object he sought." 585 F.3d 839, 844 (5th Cir. 2009). We found that the officer's use of deadly force did not violate Manis's Fourth Amendment rights, reasoning that such force is reasonable when a suspect "moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon." *Id.* (collecting cases); *accord Ontiveros v. City of Rosenberg*, 564 F.3d 379, 385 (5th Cir. 2009); *see also Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985); *Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991) (both involving a refusal to comply with police commands coupled with reaching under a car seat during a traffic stop).

On the other hand, consider our recent decision in *Poole*. In that case, Poole sued a police officer, Briceno, for excessive force after Briceno shot Poole four times in the back during a traffic stop. *Poole*, 13 F.4th at 422. The facts relevant here are as follows: Briceno responded to a police dispatch describing a silver truck that had driven down a street several times; Briceno located a silver truck at a stop sign, driven by Poole; Briceno pulled up behind

and engaged his lights and sirens; Poole evaded Briceno for fifteen minutes in a low-speed car chase; Poole eventually stopped the vehicle, exited, and reached into the bed of his truck; Briceno exited his police car, drew his weapon, and allegedly shouted "Show me your hands"; Briceno alleged that he could not see Poole's hands but believed that Poole intended to harm him or the other officers that had arrived on the scene; dashcam footage showed that, as Poole raised his hands from the truck bed, they were empty; Briceno got into a shooting stance and shouted something to Poole that is indecipherable on dashcam audio; as Poole opened the car door and lowered himself into the driver's seat, Briceno fired six times, striking Poole four times. *Id.*

The district court held that genuine issues of material fact preclude summary judgment on Briceno's qualified-immunity claim, namely (1) whether Briceno warned Poole before firing, (2) whether Poole was turned away from Briceno during the shooting, and (3) whether Briceno could see that Poole's hands were empty. *Id.* at 424. On interlocutory appeal, we held, *inter alia*, that "whether it was apparent that Poole's hands were empty" constituted a genuine dispute of material fact precluding summary judgment. *Id.* at 425.

Here, the question we must decide is whether Argueta's case is more like the *Salazar-Limon* line of furtive-gesture cases or *Poole*. On balance, we think this case is more like the former than the latter. In *Poole*, the suspect was visibly unarmed, a fact made apparent from video evidence showing his empty hands from the approximate vantage of the defendant officer. 13 F.4th at 424. Here, Argueta was armed with a high-capacity semiautomatic weapon, which he kept out of view as he fled, and needed only a slight turn to begin firing on the officers from close range. Rather than swing both of his arms, as one naturally does when running, Argueta swung only his left arm, keeping his right arm purposefully and unnaturally pressed along his right

side and out of sight as he ran away. Although Argueta did not make any *sudden* movement for his gun, as in *Manis*, Argueta's clutching his right arm to his side as he fled at top speed was tantamount to "mov[ing his arm] out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon." 585 F.3d at 844. Jaradi testified that he concluded the same and that he was concerned that he could not, if necessary, react with his handgun in time to stop an attack. We have repeatedly cautioned against "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Wilson*, 26 F.4th at 713 (citing *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019) (per curiam)).

In *Poole*, we distinguished the facts at hand from the furtive-gesture cases because, we concluded, a jury could find that Poole was "visibly unarmed" at the moment of the shooting. Thus, *Poole* was unlike furtive-gesture cases in "in which the officer could reasonably fear that the suspect was about to pull a gun from a waistband or other hidden location." 13 F.4th at 425. Here, no reasonable jury could conclude that Argueta was visibly unarmed—because he was armed. At most, a jury could conclude that Argueta was *apparently* unarmed. Considering the furtive-gesture case law, we conclude that whether Jaradi could see Argueta's weapon is immaterial because Argueta clutched his right arm to his side as he fled, which created "reasonabl[e] fear that [Argueta] was about to pull a gun from a … hidden location." *Id.*

We therefore conclude that, even taking the facts in the light most favorable to Argueta—that the gun was not visible to Jaradi when Jaradi fired—this fact question is immaterial because Argueta's clutching his right arm to his side as he fled police confrontation was a furtive gesture akin to reaching for a waistband. And again: it is Argueta's burden to establish that Jaradi is *not* entitled to qualified immunity, a protection that we honor unless

existing precedent places the constitutional question "beyond debate." *Swanson*, 659 F.3d at 371.

**2.**

As stated above, we are not persuaded that the second "fact dispute" identified by the district court—whether Argueta's flight posed any risk to the officers or the public—is a question of fact at all. As the district court appears itself to acknowledge in its citations to *Wilson* and *Blevins*, whether the suspect's flight posed a threat to the officers or onlookers is a question of law left to the court. Indeed, we have repeatedly recognized that the risk an individual poses to officers or others is part of our objective-reasonableness analysis, a legal inquiry: "The question for this court is whether [the police officer] could reasonably believe that [the fleeing suspect] posed a serious threat of harm." *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021); *see also Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (explaining that determining whether an officer acted in an objectively reasonable way is a legal question for the court which asks whether "the suspect poses a threat of serious physical harm, either to the officer or to others"); *Romero v. City of Grapevine*, 888 F.3d 170, 176–77 (5th Cir. 2018) (same) (collecting cases). Accordingly, we decline to address the genuineness or materiality of this "fact dispute" because it is actually a question of law.

Instead, we review as part of our objective-reasonableness analysis whether Argueta posed a threat to the officers or others. Our answer is straightforward: because we conclude that Argueta's concealing his right arm as he fled the police amounted to a furtive gesture akin to reaching for a waistband during a police confrontation, Jaradi's conclusion that Argueta posed an immediate danger was not unreasonable. *See, e.g.*, *Salazar-Limon*, 826 F.3d at 279; *Fraire v. City of Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992).

**3.**

Next, we consider the materiality of fact dispute three: "whether Argueta raised the gun or otherwise made a threatening motion towards the officers." Our analysis of the first fact dispute obviates this one. Even if Argueta never touched his gun and his gun remained completely concealed from the moment he exited the vehicle until after he was shot, that fact is immaterial: Argueta did not need to raise (or even show) his gun or make a threatening motion towards the officers because, by suspiciously concealing his right arm as he fled in a way that objectively suggested he was armed and dangerous, he engaged in a furtive gesture justifying deadly force. *See, e.g.*, *Salazar,* 826 F.3d at 279; *Batyukova*, 994 F.3d at 729.

**4.**

Finally, we consider the materiality of fact dispute four: "whether either officer warned Argueta before firing." Taking the facts in the light most favorable to Argueta, Argueta received no warning before Jaradi shot him.

In *Tennessee v. Garner*, the Supreme Court held:

> [I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

471 U.S. 1, 11–12 (1985). And we recently held in *Poole* that, "[e]ven when a suspect is armed, a warning must be given, when feasible, before the use of deadly force." 13 F.4th at 425; *see also Cole*, 935 F.3d at 453 (but note that the record reflected Cole was armed but not dangerous).

Notwithstanding this general rule, neither party has presented, and we have not located, clearly established law holding that a furtive gesture

signaling an immediate threat to officers followed by deadly force without warning constitutes a violation of the suspect's federal rights. To the contrary, we held in *Batyukova* that the suspect's ignoring police commands and reaching behind her back to her waistband justified deadly force notwithstanding the officer's lack of warning. 994 F.3d at 729. For this reason, we conclude that whether Jaradi issued a warning prior to firing is immaterial here.

## IV.

In sum, we hold that Argueta has failed to establish "beyond debate" that Jaradi violated a clearly established federal right.

Accordingly, we REVERSE and RENDER judgment in favor of Jaradi.

HAYNES, *Circuit Judge*, dissenting:

I would affirm the district court's order denying summary judgment to Officer Jaradi. Although I agree with the majority opinion's conclusions that there are genuine disputes of fact, I disagree with respect to the purported immateriality of these genuine factual disputes.

The majority opinion's reliance on the "furtive gesture" line of cases does not support its conclusion that the genuine factual disputes are immaterial here because each of those cases included "other factors that led the officer to suspect that the victim would resort to violence." *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023) ("[A]n officer cannot escape liability any time he claims he saw a gun. The question is whether the officer's belief that he saw a gun was sufficiently reasonable to justify the use of deadly force in light of all the surrounding circumstances."). For instance, in *Batyukova v. Doege*, where we affirmed the district court's grant of summary judgment on the "clearly established" prong, the suspect refused to comply with the officers' demands, gave them the middle finger, and yelled "f**k you," "f**k America," and, allegedly, "you're going to f**king die tonight." 994 F.3d 717, 722–23 (5th Cir. 2021). In *Salazar-Limon v. City of Houston*, we concluded there was no violation of the plaintiff's Fourth Amendment rights in light of the totality of the circumstances, "which include[d] [plaintiff's] resistance, intoxication, his disregard for [the officer's] orders, the threat he and the other three men in his truck posed while unrestrained, and [plaintiff's] actions leading up to the shooting (including suddenly reaching towards his waistband." 826 F.3d 272, 279 (5th Cir. 2016), *as revised* (June 16, 2016). Finally, in *Manis v. Lawson*, the suspect ignored the officers' orders and "began shouting obscenities and flailing his arms aggressively at them." 585 F.3d 839, 843 (5th Cir. 2009).

By contrast, these "other factors" are almost entirely absent in this case. Argueta did not verbally threaten the Officers, did not shout obscenities, did not make any *sudden* movements toward an apparent weapon, was not visibly agitated and aggressive, nor was there any suspicion that he was intoxicated. Thus, on the facts before us, there is very little justification for a reasonable officer "to suspect that [Argueta] would resort to violence." *Allen*, 65 F.4th at 744.

Indeed, the genuinely disputed facts here undermine the objective reasonableness of Officer Jaradi's use of deadly force. For instance, whether the Officers had reasonable suspicion to stop and detain Argueta for minor traffic violations certainly weighs against the objective reasonableness of the use of deadly force. *See Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (declining to extend qualified immunity to two officers on an excessive force claim in part because material issues remained as to whether the officers had reasonable suspicion to detain suspect or probable cause to arrest him); *see also Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (concluding a minor offense militated against the use of force). So too does whether Argueta fled away from the officers toward an empty lot. *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021) ("Common sense, and the law, tells us that a suspect is less of a threat when he is turning or moving away from the officer."). The warning, or lack thereof, is also equally material to the objective reasonableness calculus. *See Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (en banc) (explaining an officer must give a warning, where feasible, before using deadly force because a warning is "a critical component of risk assessment and de-escalation").

In short, if the jury views the disputed factors in Argueta's favor—concluding that the Officers had no reason to stop and detain Argueta and that within five seconds of Argueta exiting his vehicle, Officer Jaradi shot him twice in the back, without warning, as Argueta ran away from the Officers

toward a vacant lot with his right arm obscured from view during flight—then Officer Jaradi violated Argueta's clearly established right to be free from unreasonable seizure. *See Poole*, 13 F.4th at 426 (holding that if a jury views the disputed facts in favor of the plaintiff—"concluding that [the officer] shot [the suspect], without warning, seeing that he was empty handed and turning away from the officer"—then the clearly established prong was satisfied); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017) (explaining for the particular conduct to be clearly established there need not be a case directly on point nor is it necessary that "the very action in question has previously been held unlawful").

I therefore respectfully dissent from the majority opinion with respect to the immateriality of the genuine factual disputes. Accordingly, I would affirm the district court's order denying summary judgment to Officer Jaradi on qualified immunity grounds.